526 S.E.2d 732

**Lt. J.A. FLEMING, Jr., Appellant,**

**v.**

**Boykin ROSE and James Caulder, Respondents.**

**No. 3101.**

Court of Appeals of South Carolina.

Heard Dec. 8, 1999.

Decided Jan. 17, 2000.

Rehearing Denied March 25, 2000.

John A. O'Leary, of O'Leary Associates, of Columbia, for appellant.

James A. Stuckey and Alexia Pittas–Giroux, both of Stuckey Law Offices, of Charleston, for respondents.

ANDERSON, Judge:

In this tort action, Lt. J.A. Fleming, Jr., formerly of the South Carolina Highway Patrol, appeals from the trial court's order granting summary judgment to Boykin Rose of the South Carolina Department of Public Safety and James Caulder of the South Carolina Highway Patrol. We affirm in part, reverse in part, and remand.

### *FACTS/PROCEDURAL BACKGROUND*

In the early morning hours of December 19, 1991, four Highway Patrol Troopers and their wives were involved in a traffic accident as they returned from the Georgetown County Patrol Unit Christmas party, which was held at a restaurant in Myrtle Beach. A car struck the troopers' van as it approached the intersection of South Carolina Highway 707 and the U.S. 17 by-pass.

The Highway Patrol initially investigated the accident. At the hospital, Trooper Glenn Cottingham, the driver of the van, told Investigator Jerry Gowdy, the van was traveling at 70 miles per hour at one point. Cottingham claimed that at the time of the accident he was driving approximately 45 miles per hour.

In 1992, Trooper Jerry Cobb, a passenger in the van, became dissatisfied with his portion of the insurance settle-

ment from the accident. Cobb told Cottingham he had to have $80,000.00 and that "heads are going to roll."

In May of 1992, Trooper Cobb called Fleming and asked to meet him. The two men met in a Wal–Mart parking lot. It was an informal meeting. They discussed golf and other matters of a social nature. Additionally, Cobb told Fleming (1) he was angry because Trooper Cottingham and his wife were "going to get all the damn insurance money" from the accident; (2) he was upset because the people in Georgetown had collected money for the Cottinghams, but not for Cobb and his wife; (3) that "all his supervisors in every place he had been are always bringing him to Florence over things he had done wrong, and ... he was tired of it"; and (4) that Cobb's attorney was getting his statement back from SLED. To Fleming, the meeting was just a courtesy he extended to a fellow officer who asked to speak with him. The following Monday, Fleming relayed to Caulder everything Cobb had told him. Further, Fleming advised Caulder "the shit is getting ready to hit the fan in Georgetown."

Internal Affairs then conducted a second investigation into the accident. Pursuant to this investigation, Cottingham and other troopers involved in the accident and investigation were indicted. When special prosecutors later dismissed the indictments, Boykin Rose, Director of the newly formed Department of Public Safety, assigned Principal Deputy Director, Robert Ivey, to review past investigations and files and to conduct an administrative inquiry into the actions of the troopers involved in the accident and the role of the Highway Patrol regarding its previous investigation of the accident.

At the conclusion of the investigation, Ivey submitted a summary report to Rose. A few days later, Ivey presented a memo to Rose which contained recommendations for disciplinary actions against the troopers involved in the accident. This memo included a recommendation that Lt. James Fleming, who was not involved in either the accident or any of the subsequent investigations, be suspended for five days for allegedly failing to thoroughly interview Trooper Jerry Cobb. Additionally, the memo contained the allegation that Fleming failed to pass on crucial details regarding the accident.

In response to these allegations, Fleming maintained Cobb did not convey information to him regarding the specific speed the van was traveling and further he relayed all information he learned from Cobb to his supervisor, Captain Caulder. Caulder confirmed Fleming's testimony Fleming informed him of the meeting with Cobb. Caulder further stated he decided not to pass any of the information he received from Fleming on to his supervisors.

Despite Fleming's protestations of innocence, the Department of Public Safety issued a press release on April 6, 1994, which grouped Fleming with the troopers involved in the accident and accused Fleming and the others of setting a "deplorable example." The contents of the press release were reprinted in newspapers throughout the state. Fleming unsuccessfully attempted to delay the inclusion of his name in the press release until he had an opportunity to clear himself. Rose reduced Fleming's sanction from a five day suspension to a letter of reprimand.

Approximately six months before the reprimand, Fleming had applied for early retirement from the Department of Public Safety in order to receive a retirement bonus. Following the reprimand, Fleming completed that process and retired. Thereafter, Fleming filed this action against Boykin Rose and James Caulder alleging slander, intentional infliction of emotional distress/outrageous conduct, and violation of due process. Rose and Caulder filed motions for summary judgment. The Circuit judge granted summary judgment in favor of Rose and Caulder on all three of Fleming's causes of action.

### ISSUES

I. Did the trial judge err in granting summary judgment as to the libel cause of action?

II. Did the trial judge err in granting summary judgment as to the cause of action for intentional infliction of emotional distress?

III. Did the trial judge err in granting summary judgment as to the cause of action alleging a violation of due process?

## STANDARD OF REVIEW

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Young v. South Carolina Dep't of Corrections*, 333 S.C. 714, 511 S.E.2d 413 (Ct.App.1999); Rule 56(c), SCRCP. In determining whether any triable issue of fact exists, as will preclude summary judgment, the evidence and all inferences which can be reasonably drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 518 S.E.2d 301 (Ct.App.1999). If triable issues exist, those issues must go to the jury. *Young, supra.*

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing and Regulation, et al.*, 337 S.C. 476, 523 S.E.2d 795 (1999). All ambiguities, conclusions, and inferences arising from the evidence must be construed most strongly against the moving party. *Vermeer, supra.* Even when there is no dispute as to evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Id.* In general, if the pleadings and the evidentiary matter in support of summary judgment do not establish the absence of a genuine issue of material fact, summary judgment must be denied, even if no opposing evidentiary matter is presented. *Baird v. Charleston County*, 333 S.C. 519, 511 S.E.2d 69 (1999). Because it is a drastic remedy, summary judgment should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues. *Carolina Alliance, supra.*

## LAW/ANALYSIS

### I. LIBEL

Fleming argues the trial court erred in granting summary judgment in favor of Rose and Caulder as to his cause of action for libel. Counsel for Fleming characterizes the action as one for slander. However, because this case involves the printing of allegedly defamatory statements, we are treating it

as a libel action. *See Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 506 S.E.2d 497 (1998) (*Holtzscheiter II* ).

The scholarly work of *Prosser & Keeton on the Law of Torts* acknowledges that "there is a great deal of the law of defamation which makes no sense." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 111, at 771 (5th ed.1984). In South Carolina, decisions emanating from the appellate entities have admittedly resulted in obfuscation:

> The confusion in South Carolina defamation law has been compounded by the fact that this Court's opinions have not completely taken into consideration the impact of decisions by the United States Supreme Court. Since the 1960's, the Supreme Court has attempted "to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789, 797 (1974). The effect of these decisions has been the interweaving of federal constitutional principles into the fabric of state defamation law. Because state defamation rules have become inextricably tied to these constitutional principles, it is not possible to review defamation issues in a state law vacuum.

*Holtzscheiter II,* 332 S.C. at 517, 506 S.E.2d at 505 (Toal, J., concurring in result in separate opinion).

 The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Swinton Creek Nursery v. Edisto Farm Credit,* 334 S.C. 469, 514 S.E.2d 126 (1999). The focus of defamation is not on the hurt to the defamed party's feelings, but on the injury to his reputation. *See Wardlaw v. Peck,* 282 S.C. 199, 318 S.E.2d 270 (Ct.App.1984). Defamatory communications take two forms: libel and slander. *Swinton Creek Nursery, supra.* Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. *Id.*

The defamatory meaning of a message or statement may be obvious on the face of the statement, in which case the statement is defamatory *per se. Holtzscheiter II, supra.* If the defamatory meaning is not clear unless the hearer knows

facts or circumstances not contained in the statement itself, then the statement is defamatory *per quod. Id.*

A separate issue is whether the statement is "actionable *per se* " or not. *Id.* This issue is one of pleading and proof and is always a question of law for the court. *Id.* If a defamation is actionable *per se*, then under common law principles the law presumes the defendant acted with common law malice and that the plaintiff suffered general damages. *Id.* If a defamation is not actionable *per se*, then at common law the plaintiff must plead and prove common law actual malice and special damages. *Id.*

"Libel is actionable *per se* if it involves 'written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous....' " *Holtzscheiter II,* 332 S.C. at 510, 506 S.E.2d at 502 (quoting *Lesesne v. Willingham,* 83 F.Supp. 918, 921 (E.D.S.C.1949)). In other words, if the trial judge can legally presume, because of the nature of the statement, that the plaintiff's reputation was hurt as a consequence of its publication, then the libel is actionable *per se. Id.* Essentially, all libel is actionable *per se. Id.*

█ The elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Holtzscheiter II, supra* (Toal, J., concurring in result in separate opinion). A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Id.*

█ In addition to being defamatory, the statement must be false. *Id.* Under the common law, a defamatory communication was presumed to be false. *See Beckham v. Sun News,* 289 S.C. 28, 344 S.E.2d 603 (1986). However, truth could be asserted as an affirmative defense. *See Ross v. Columbia Newspapers, Inc.,* 266 S.C. 75, 221 S.E.2d 770 (1976). The Supreme Court's holding in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559, 89 L.Ed.2d

783, 787 (1986), modified the common law rule: "[A]t least where a newspaper publishes speech of public concern, a private figure plaintiff cannot recover damages without also showing that the statements at issue are false." Thus, an initial question that must be answered is whether the speech is of public concern. *Holtzscheiter II, supra* (Toal, J., concurring in result in separate opinion). If it is a matter of public concern (at least where a media defendant is involved), the plaintiff must also prove its falsity. *Id.* If it is a matter of private concern, the plaintiff does not have to prove falsity. *Id.* "The publisher may avoid liability if it successfully proves the statement is true (i.e. the affirmative defense of truth is available to the publisher in any type of case)." *Id.* at 531, 506 S.E.2d at 513. Whether a communication is reasonably capable of conveying a defamatory meaning is a question of law for the trial court to determine. *Id.*

The second major element of defamation is an unprivileged publication to a third party. The publication of defamatory matter is its communication, intentionally or by a negligent act, to a third party—someone other than the person defamed. *Id.*

The third element of defamation is fault on the part of the publisher. *Id.* The degree of fault a plaintiff must establish depends upon his status as a public or private figure. *Id.* As a state trooper, Fleming is a 'public figure' for constitutional purposes. *See Botchie v. O'Dowd,* 315 S.C. 126, 432 S.E.2d 458 (1993); *McClain v. Arnold,* 275 S.C. 282, 270 S.E.2d 124 (1980); *Gause v. Doe,* 317 S.C. 39, 451 S.E.2d 408 (Ct.App. 1994).

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), the United States Supreme Court announced, "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *See Sanders v. Prince,* 304 S.C. 236, 403 S.E.2d 640 (1991) (in a case involving defamation of a public official, plaintiff must prove defendant acted with actual mal-

ice). The Court, in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), extended the *New York Times* standard to protect defamatory criticism of "public figures," in addition to "public officials." Hence, public persons "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 807 (1974). Fleming was required to show Rose and Caulder knew the statements in the press release concerning him were false or they acted in reckless disregard of the falsity of the statements.

■ *Holtzscheiter II* edifies in regard to the necessity to disavow the distinction between libel *per se* and libel *per quod* by adopting § 569 of the Restatement (Second) of Torts, which provides: "One who falsely publishes matter defamatory of another in such a manner as to make the publication a libel is subject to liability to the other although no special harm results from the publication." Restatement (Second) of Torts § 569 (1977). Under the Restatement, it is not necessary for Fleming to establish special harm nor is he required to show special damages in order to recover.

■ Rose and Caulder argue Fleming failed to present any evidence of actual malice. We affirm the trial court's ruling as to Caulder. There is no evidence in the record Caulder was responsible for the press release or the decision to include Fleming's name. Caulder did not make a statement to anyone accusing Fleming of failing to thoroughly interview Cobb. Additionally, the record indicates Caulder attempted to stop the publication of Fleming's name. At oral argument, counsel for Fleming consented to a dismissal of Caulder.

■ On the other hand, as to Rose, viewing the evidence in the light most favorable to Fleming, the following evidence exists from which a jury could infer Rose either knew the press release was false or acted with reckless disregard of the falsity of the press release. Rose had the ultimate authority to approve the press release. Louis Fontana testified there was concern and discussion at DPS as to the propriety of releasing names. Fontana further stated Val Valenta, Legal Counsel at DPS, expressed concern about releasing names.

Alton Morris, former Colonel of the Highway Patrol, testified that in the case of disciplinary action the release of names was not normal policy. He stated the press release could have been written without using names and called the press release unique.

Colonel James Caulder testified the release of names had never been done before. In contrast, Rose testified he followed normal procedure in releasing Fleming's name prior to giving him an opportunity to contest the disciplinary decision.

Ivey's investigation of Fleming for DPS did not include Fleming's direct supervisor, Caulder. Ivey never asked Caulder whether he passed on the information received from Fleming. Rose testified he had "no idea" where information implicating Fleming originated. Rose further testified he was not aware Caulder had not been interviewed regarding the information he received from Fleming. Rose could not remember stating in an interview "these men set a deplorable example" but conceded "there were a lot of mistakes made in this case."

Fleming testified the allegation in the press release that he failed to pass on crucial information was false—"What I'm saying is everything that Jerry Cobb told me, I told Captain Caulder without a doubt." Based on the above evidence, we hold the trial court erred in granting summary judgment in favor of Rose as to Fleming's cause of action for libel.

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Fleming complains the trial court erred in granting summary judgment as to his cause of action for intentional infliction of emotional distress/outrage. We initially note there is no separate tort for outrage. The two causes of action are one and the same. *See Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981).

The Supreme Court first recognized the tort of intentional infliction of emotional distress in *Ford v. Hutson:*

Inasmuch as this court has already implicitly indicated that conduct intended to invade freedom from severe emotional distress is tortious, we now lend express recognition

to this proposition. We adopt the rule of liability stated in § 46 of the *Restatement (Second) of Torts* relating to intentional infliction of emotional distress:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Ford,* 276 S.C. at 162, 276 S.E.2d at 778.

 To recover for the intentional infliction of emotional distress, a plaintiff must establish (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the defendant's conduct was so extreme and outrageous that it exceeded all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Id.*

 Initially, the court determines, from the materials before it, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *See McSwain v. Shei,* 304 S.C. 25, 402 S.E.2d 890 (1991). *See also Andrews v. Piedmont Air Lines,* 297 S.C. 367, 377 S.E.2d 127 (Ct.App.1989) (question of whether defendant's conduct may be reasonably regarded as so extreme and outrageous as to allow recovery for outrage is question for court to determine). However, once conduct is shown which may be reasonably regarded as extreme and outrageous, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability. *Id.* In the instant case, the trial court concluded: "As a matter of law the defendants' conduct was not so extreme and outrageous that it exceeded all possible bounds of decency and was atrocious and utterly intolerable in a civilized community."

538

Our Supreme Court, in *Holtzscheiter v. Thomson Newspapers, Inc.*, 306 S.C. 297, 411 S.E.2d 664 (1991) (*Holtzscheiter I* ), held libel in that case fell short of the standard required for extreme and outrageous conduct. *See also Upchurch v. New York Times Co.*, 314 S.C. 531, 431 S.E.2d 558 (1993). The majority of cases finding outrageous conduct generally require "hostile or abusive encounters" or "coercive or oppressive conduct." *See Gattison v. South Carolina State College*, 318 S.C. 148, 456 S.E.2d 414 (Ct.App.1995); *Wright v. Sparrow*, 298 S.C. 469, 381 S.E.2d 503 (Ct.App.1989). *Accord McSwain v. Shei*, 304 S.C. 25, 402 S.E.2d 890 (1991) (holding jury could find outrageous and intolerable the conduct of an employer who forced employee to perform exercises in public which exposed her incontinence problem to others). *See also Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981) (affirming submission of case to jury when evidence demonstrated homebuyer repeatedly subjected plaintiff real estate agent to public browbeatings, obscenities, and threats over a two year period, and entered her home without permission verbally attacking her in front of guests); *Corder v. Champion Road Mach. Int'l Corp.*, 283 S.C. 520, 324 S.E.2d 79 (Ct.App.1984) (finding that mere retaliatory discharge for filing a Workers' Compensation claim, absent claims of verbal assaults or hostile, abusive encounters, did not rise to the level required for the tort of intentional infliction of emotional distress).

In the case *sub judice*, there is no evidence of any hostile or abusive encounter or any suggestion of coercive or oppressive conduct such as found in *McSwain* or *Ford*. After reviewing the evidence in the light most favorable to Fleming, we find the facts of this case do not establish the conduct of either Rose or Caulder was so extreme and outrageous as to constitute intentional infliction of emotional distress. The facts alleged fall short of conduct that exceeds all possible bounds of decency. Further, there is no action which might be regarded as atrocious and utterly intolerable in a civilized society. We therefore affirm the trial court's grant of summary judgment in favor of Rose and Caulder as to this cause of action.

### III. DUE PROCESS

Fleming asserts the trial court erred in granting summary judgment as to the 42 U.S.C. § 1983 action in which he alleged a violation of due process. We disagree.

Title 42 U.S.C. § 1983 (Supp.1999) allows a civil action for damages against a government official who deprives an individual of a constitutionally protected right. *See Eubanks v. Smith,* 292 S.C. 57, 354 S.E.2d 898 (1987). The asserted right in this case derives from the Fourteenth Amendment which protects against governmental deprivation of a person's liberty or property without procedural due process. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), Davis' photograph was included by local police chiefs in a "flyer" of "active shoplifters," after Davis had been arrested for shoplifting. The flyer, and Davis' inclusion therein, soon came to the attention of Davis' supervisor, who called him in to hear his version of the events leading to his appearing in the flyer. Following this discussion, the supervisor informed Davis that although he would not be fired, he " 'had best not find himself in a similar situation' in the future." *Id.* at 696, 96 S.Ct. at 1158, 47 L.Ed.2d at 411. The shoplifting charge was eventually dismissed, and Davis filed suit under 42 U.S.C. § 1983 against the police chiefs.

Davis' due process claim was grounded upon his assertion that the flyer, and in particular the phrase "Active Shoplifters" appearing at the head of the page upon which his name and photograph appear, impermissibly deprived him of some "liberty" protected by the Fourteenth Amendment. His complaint asserted the "active shoplifter" designation would inhibit him from entering business establishments for fear of being suspected of shoplifting and possibly apprehended, and would seriously impair his future employment opportunities.

In finding the facts of that case did not establish a cause of action under § 1983, the Supreme Court ruled: "[T]he Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.* at 706, 96 S.Ct. at 1163, 47 L.Ed.2d at 416–17. Accordingly, it is clear that stigma or defamation alone, unconnected with a loss of government employment, is not actionable under the Fourteenth Amendment. *Id.*

In order to claim entitlement to the protections of the due process clause, a plaintiff must first show that he has

540

a constitutionally protected liberty or property interest, and that he has been deprived of that protected interest by some form of state action. *See Johnson v. Morris,* 903 F.2d 996 (4th Cir.1990). Injury to reputation, standing alone, is not enough to demonstrate deprivation of a liberty interest. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Yet, injury to reputation *does* deprive a person of a liberty interest when the injury is combined with the impairment of "some more tangible" government benefit. *Id.* at 701, 96 S.Ct. at 1161, 47 L.Ed.2d at 414. It is enough, for example, if the plaintiff shows the reputational injury causes the "loss of government employment." *Id.* at 706, 96 S.Ct. at 1163, 47 L.Ed.2d at 416–17. Publication of stigmatizing charges alone, without damage to "tangible interests such as employment," does not invoke the due process clause. *Id.* at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 414. *See also Stone v. University of Maryland Medical Sys. Corp.,* 855 F.2d 167, 172–73 n. 5 (4th Cir.1988) (citations omitted) ("[T]he clear implication from *Paul v. Davis* ... is that a public employer's stigmatizing remarks do not deprive an employee of a liberty interest unless they are made in the course of a discharge or significant demotion. Our finding that Stone was not discharged from his public employment but resigned voluntarily thus effectively disposes of any liberty interest claim he might assert."). "The words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law." *Id.* at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 414. No constitutional doctrine converts every defamation by a public official into a deprivation of liberty within the meaning of the due process clause. *Id.* Defamation, by itself, is a tort actionable under the laws of most states, but not a constitutional deprivation. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

The record in the instant case demonstrates Fleming did not suffer any adverse employment action. He retired without being demoted or penalized. In fact, Fleming received a retirement bonus. We therefore are constrained to hold the trial court did not err in granting summary judgment to Rose and Caulder as to Fleming's § 1983 action.

*CONCLUSION*

We reverse the grant of summary judgment to Rose on the cause of action for libel and hold Fleming is entitled to a jury trial on the theory of libel as against Rose. Additionally, we affirm the grant of summary judgment to Rose and Caulder on the theories of intentional infliction of emotional distress and the § 1983 action. Finally, we affirm the grant of summary judgment to Caulder on the cause of action for libel based on consent of counsel for Fleming at oral argument. Accordingly, the judgment of the Circuit Court is

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

CONNOR and STILWELL, JJ., concur.