567 S.E.2d 857

**Lt. J.A. FLEMING, Jr., Respondent,**

v.

**Boykin ROSE and James Caulder, Defendants,**

**of whom Boykin Rose is, Petitioner.**

No. 25500.

Supreme Court of South Carolina.

Heard April 3, 2002.

Decided July 22, 2002.

490

James A. Stuckey and Alexia Pittas–Giroux, both of Stuckey Law Offices, of Charleston, for petitioner.

John A. O'Leary, of O'Leary Associates, of Columbia, and John S. Nichols, of Bluestein & Nichols, of Columbia, for respondent.

Jay Bender, of Baker, Ravenel & Bender, of Columbia, for amici curiae South Carolina Broadcasters Association and South Carolina Press Association.

Chief Justice TOAL.

This Court granted Boykin Rose's ("Rose") petition for certiorari to review the Court of Appeals' opinion in *Fleming v. Rose*, 338 S.C. 524, 526 S.E.2d 732 (Ct.App.2000). Rose argues the Court of Appeals erred in reversing the trial

court's grant of summary judgment on the cause of action for libel.

## FACTUAL/PROCEDURAL BACKGROUND

This case arose from the investigation of a December 19, 1991, traffic accident. In the early morning hours of December 19, a car struck a van carrying four troopers and their wives home from a holiday party. Several of the troopers and their wives were injured. An investigation was ordered. However, the investigation was handled very poorly, a possible cover-up ensued, and the incident resulted in a public relations debacle for the South Carolina Department of Public Safety ("SCDPS").[1] A second investigation was conducted by Internal Affairs, SLED, solicitor Ralph Wilson, and special prosecutors Donnie Myers and Dick Harpootlian. The troopers in the van and some others involved in the cover-up were indicted,[2] and SCDPS was sued by the other driver involved in the accident. The other driver, who was a civilian, was charged with felony DUI, but the charges were later dropped.

In July 1993, Rose became director of SCDPS. Rose ordered a third investigation of the alleged cover-up and appointed Robert Ivey ("Ivey") and John Murphy ("Murphy") to head the inquiry. Ivey and Murphy interviewed 100–125 people over the approximate five month investigation. During the investigation, the investigators determined that Respondent, Lt. James Fleming ("Fleming") had been contacted by one of the troopers involved in the accident, Jerry Cobb ("Cobb"). Cobb radioed Fleming, who was his supervisor, and

---

1. From the record, it appears the main problem with the investigation involved the speed of the troopers' vehicle. Immediately after the accident, the driver of the van stated that although he was traveling at 70 miles per hour prior to the accident, at the time of the accident, he was driving 45 mph (the speed limit at the scene was 45). Apparently, the other troopers in the van confirmed the story at first. The initial accident report indicates the troopers' van was traveling 45 mph. However, the skid marks left at the scene, which were not examined until much later, indicated the van was traveling about 67 mph. Furthermore, at least one occupant of the van later changed his story to indicate the van was traveling around 70 mph. There was also some question as to whether the troopers had open containers of alcohol in the van.

2. These indictments were later dismissed.

asked him to meet him in Georgetown. According to Fleming, the meeting began with a discussion of golf and social matters. In addition, Cobb expressed his anger that Trooper Cottingham, who was also involved in the accident, was going to receive most of the insurance money and that the people in Georgetown had collected money for the Cottinghams but not for Cobb and his wife. Cobb indicated he and his attorney were going to get his original statement concerning the accident back from SLED because it was false. Furthermore, Fleming testified Cobb complained that "all his supervisors in every place he had been were always bringing him to Florence over things he had done wrong and he was tired of it" and "the s—was about to hit the fan." According to Fleming's testimony, his conversation with Cobb took place on a Saturday, and on Monday, Fleming relayed the conversation to his supervisor, James Caulder ("Caulder").

The main debate concerns whether Cobb told Fleming: (1) that the van was speeding at the time of the accident; and (2) that he had lied about the speed to the initial investigating officers. This was considered vital because if Fleming had passed this information on to Caulder, the investigation could have been concluded more quickly. Ivey testified that in his interview, Fleming indicated Cobb had told him the van was speeding at the time of the accident. The interview report form indicates Fleming recalled Cobb talking about the speed of the van. Fleming testified he could not recall Cobb mentioning a specific speed, but that he could have mentioned the van was speeding. However, Fleming stated he absolutely relayed the entire conversation to his supervisor Caulder the next work day.[3]

At the close of the investigation, Ivey and Murphy issued a report to Rose. They recommended Fleming receive a five-day suspension for failing to carry out his duties as a lieutenant by not reporting the entire contents of his conversation with Cobb to his supervisor. However, this discipline was reduced to a written reprimand.[4]

---

3. Fleming has been adamant throughout that he never lied or misled Caulder or anyone else. He offered to take a lie detector test or truth serum, neither of which were ever administered.

4. Fleming repeatedly tried to contest the reprimand, but under SCDPS' policies, a written reprimand is not grievable.

After the investigation was concluded, Rose and the SCDPS issued a press release. Many articles were published by various newspapers around the state based on this release. It is this release Fleming alleges is defamatory. The release provides, in relevant part: "Lt. James Fleming learned key details about the accident from ... Jerry Cobb within a few months of the accident, including the approximate speed of the van. Fleming did not report this information to his superiors."

On January 22, 1996, Fleming filed a cause of action against Rose and Caulder for libel, intentional infliction of emotional distress, and due process violations. Rose and Caulder moved for summary judgment. On September 11, 1998, the circuit judge granted summary judgment and dismissed the action, ruling that Fleming was a public official and the publication had been limited to fair comment without actual malice. Fleming and Caulder appealed. The Court of Appeals affirmed the grant of summary judgment to Caulder but reversed the grant to Rose, holding there was evidence in the record from which the jury could infer Rose acted with actual malice. *Fleming v. Rose*, 338 S.C. 524, 526 S.E.2d 732 (2000). Rose petitioned this Court for certiorari. The sole issue now before this Court is:

> Did the Court of Appeals err in reversing the trial court's grant of summary judgment to Rose, and holding the record contained sufficient evidence to send the question of whether Rose acted with actual malice to the jury?

## Law/Analysis

Rose argues the Court of Appeals erred in reversing the trial court's grant of summary judgment as to the cause of action for libel. We agree.

When reviewing the grant of summary judgment, the appellate court applies the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *Peterson v. West Am. Ins. Co.*, 336 S.C. 89, 94, 518 S.E.2d 608, 610 (Ct.App. 1999). Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party must prevail as a matter of law. Rule 56(c), SCRCP. When determining if any triable issues of fact exist, the evidence and

all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Summer v. Carpenter*, 328 S.C. 36, 492 S.E.2d 55 (1997).

In order to prove defamation, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm.[5] *Holtzscheiter v. Thomson Newspapers*, 332 S.C. 502, 506 S.E.2d 497 (1998) (Toal, J. concurring in result in a separate opinion) (*Holtzscheiter II*). The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Id.*

### A. Fault of the Publisher

Fleming, at all times at issue in this case, was a lieutenant serving as a highway patrol officer in the SCDPS. Therefore, he is a "public figure" for the purposes of defamation law. *State v. Bridgers*, 329 S.C. 11, 16, 495 S.E.2d 196, 198 (1997) ("Highway Patrol officers are 'public officials.' "). When a public figure seeks to recover damages for a defamatory falsehood relating to his official conduct, the "fault" he must prove is that the statement was made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964); *Elder v. Gaffney Ledger*, 341 S.C. 108, 533 S.E.2d 899 (2000). Actual malice means the publisher of the statement had knowledge the statement was false or acted with reckless disregard as to whether or not it was false. *Id.* In addition, the public figure must demonstrate actual malice by "clear and convincing proof." *Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.*, 738 F.Supp. 1499, 1506 (D.S.C.1989) (citing *New York Times v. Sulllivan*); *Miller v. City of W. Columbia*, 322 S.C. 224, 228, 471 S.E.2d 683, 685 (1996) ("To recover on a

---

5. As discussed below, Fleming was a public figure. Since the statement was a written defamation (libel) and concerned a public figure, Fleming is not required to show special harm or damages. *Holtzscheiter v. Thomson Newspapers*, 332 S.C. 502, 506 S.E.2d 497 (1998).

claim for defamation, the constitutional actual malice standard requires a public figure to prove by clear and convincing evidence that the defamatory falsehood was made with [actual malice]"); *Botchie v. O'Dowd,* 315 S.C. 126, 432 S.E.2d 458 (1993).[6]

Recently, in *Elder v. Gaffney Ledger,* this Court discussed the constitutional actual malice standard.[7]

> The constitutional actual malice standard requires a public official to prove by clear and convincing evidence that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth. A "reckless disregard for the truth, however, requires more than a departure from reasonable prudent conduct." There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubt as to the truth of his publication.* There must be evidence the defendant had a *"high degree of awareness of . . . probable falsity."*

*Elder,* 341 S.C. at 114, 533 S.E.2d at 902 (emphasis added by the Court) (citations omitted). Fleming has not provided clear and convincing proof that Rose "in fact entertained serious doubt as to the truth of the publication" or that Rose had a "high degree of awareness" that the press release was false.

■ The Court of Appeals found there was evidence in the record to indicate Rose acted with reckless disregard of the falsity of the press release. The opinion focused on two factors or "groups" of evidence to support their conclusion: (1) the testimony of Louis Fontana and Alton Morris who stated the normal policy was not to release the names of police

---

6. Fleming, in his brief to this Court, argues that at the summary judgment stage of the proceedings, it is only necessary for the non-moving party to submit a "scintilla of evidence warranting a determination by a jury." (citing *Hill v. York County Sheriff's Dep't,* 313 S.C. 303, 437 S.E.2d 179 (Ct.App.1993) for support). In light of the federal and state cases on causes of action for libel brought by a public figure requiring "clear and convincing proof," we disagree with Fleming's characterization that he needs only to produce a scintilla of evidence that Rose acted with actual malice in order to defeat Rose's motion for summary judgment.

7. This case was decided after the Court of Appeals issued its opinion in the instant case. However, it did not announce a new standard of proof. See *Miller v. City of West Columbia, supra.*

officers involved in disciplinary proceedings; and (2) the fact that the investigation did not involve Fleming's direct supervisor, Caulder, and Caulder was not asked about whether Fleming passed on the information he received during his conversation with Cobb. *Fleming, supra.*

In regard to the first factor, the Court of Appeals should not have given such great weight to the fact that the names were not normally released. In *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), the United States Supreme Court held that a court could consider evidence that a newspaper departed from professional standards when deciding if the newspaper acted with actual malice. However, the Court clarified the statement by saying, "... courts must be careful not to place too much reliance on such factors...." *Id.* at 668, 109 S.Ct. at 2686. Furthermore, *Harte–Hanks* involved the *media publishers '* investigation and their failure to follow accepted media industry standards for investigating information provided by informants. The instant case involves a *police investigation,* and there is no evidence that the investigation conducted by Murphy and Ivey did not conform with police investigatory standards. Finally, although the names of officers involved in disciplinary action were normally not released, we cannot hold this constituted a violation of a "professional standard."

In regard to the second factor relied on by the Court of Appeals, we find the conclusion is not supported by the record. Caulder stated in his deposition that he was interviewed by Ivey. He stated that although he could not recall Ivey questioning him about the information Fleming conveyed to him about his conversation with Cobb, he could not say for certain Ivey had not asked him about the meeting. Ivey testified he interviewed Caulder, and Ivey's report to Rose contained a portion of the interview. Ivey stated Caulder told him Fleming reported Cobb was angry about the insurance money distributed after the accident and upset about the amount of community support another couple injured in the accident had received. Ivey also testified Caulder told him Fleming had not reported that Cobb had lied about the speed of the van.

We find the facts relied on by the Court of Appeals' do not amount to "clear and convincing" proof that Rose acted with actual malice. The evidence shows Rose relied on the results and conclusions of an investigation conducted by two highly respected investigators. Rose testified he had no reason to doubt the investigation was not thorough, solid, correct, and truthful. Others involved in the press release testified "there was obviously a strong feeling that the information was correct." The evidence shows Rose relied completely on the investigation by Ivey and Murphy and had full faith in the veracity of their report. There is no evidence, much less clear and convincing evidence, that Rose had knowledge that the statement setting forth the findings of the investigation with regard to Fleming was false, if it was indeed false, or that he had serious doubts as to the truth of the report. Moreover, actual malice cannot be shown from Rose's failure to perform his own investigation because there were no obvious reasons to doubt the veracity of Ivey's report and no evidence that Rose was purposefully avoiding the truth.

### B. Falsity and Publication

Because Fleming cannot show by clear and convincing proof that Rose acted with actual malice, there is no need for this Court to address the other elements of defamation.

### CONCLUSION

Based on the above evidence, we hold the Court of Appeals erred in finding there was "clear and convincing" evidence in the record to support Fleming's claim that Rose acted with actual malice. Therefore, we **REVERSE** the decision of the Court of Appeals with respect to Rose, and reinstate the trial court's grant of summary judgment.

MOORE, WALLER, BURNETT and PLEICONÉS, JJ., concur.