631 S.E.2d 286

Philip H. WILLIAMS, Appellant,

v.

LANCASTER COUNTY SCHOOL DISTRICT, James W. Jordan and John Taylor, Respondents.

Barbara Williams, Appellant,

v.

Lancaster County School District, James W. Jordan and John Taylor, Respondents.

No. 4117.

Court of Appeals of South Carolina.

Submitted April 1, 2006.

Decided May 30, 2006.

294

296

Melvin D. Bannister, of Columbia, for Appellants.

Andrew F. Lindemann, David L. Morrision, of Columbia, for Respondents.

HUFF, J.:

In this tort action, Philip and Barbara Williams appeal from the trial court's order granting summary judgment to the Lancaster County School District, James W. Jordan and John Taylor (Respondents) on their claims for slander, intentional infliction of emotional distress, intentional interference with contractual relations, and loss of consortium. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

This matter revolves around three incidents at Buford High School involving Philip Williams and his wife, Barbara, and their children, LeAnn and Clark. Both Philip and Barbara were employed by the Lancaster County School District during the 2000–2001 school year. Philip was employed as the head football coach and athletic director, as well as a teacher

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

at Buford High School (Buford). Barbara was a teacher at Buford. LeAnn and Clark attended Buford. Dr. James Jordan was the principal of Buford, Mr. John Hardin was an assistant principal at Buford, and Mr. John Taylor was the Superintendent of the Lancaster County School District (District) The incidents involve LeAnn's class ranking, a situation involving rumors that circulated after Philip was discovered in a locked bathroom with a school secretary, and a test grade initially given to Clark.

During the 2000–2001 school year, the State Department of Education (Department) implemented a uniform grading system. So that no student in that year's senior class would be damaged by the implementation of the new system, principals were given flexibility and allowed to use a dual system with that class in ranking them. Apparently, the staff at Buford had been working to insure that both LeAnn and another student remained tied for the number one spot, which would result in significant scholarship monies. However, with the implementation of the new uniform system, LeAnn was not ranked number one. Further, although LeAnn had been ranked number one along with the other student under the old system, LeAnn dropped a course during the school year and was no longer tied with the other student under the old system. LeAnn had dropped one of her courses because she was enrolled in two different weightlifting classes during the same semester, which was a violation of Department regulations that prohibited students from receiving dual credit.

Around February 2001, the Williamses learned LeAnn slipped to number two in her class. Philip went to LeAnn's guidance counselor, who told him he would have to speak with the principal, Dr. Jordan. Because Philip was not getting along with Dr. Jordan at that time, Barbara approached Dr. Jordan about the matter, which resulted in some heated words between the two. Thereafter, LeAnn's guidance counselor, Mr. Hudson, was instructed by Assistant Principal Hardin or Dr. Jordan to not discuss LeAnn's situation with the Williamses unless Mr. Hardin or Dr. Jordan was present. Subsequently, the Williamses made three trips to the Superintendent's office to look into the matter and called multiple times. According to the Assistant Superintendent for Instruction, Dr. Burns, she told the Williamses they would work with

them to insure LeAnn would have every opportunity to earn credit and have a full schedule. Dr. Jordan contacted Dr. Burns and asked that LeAnn be allowed to take a course in service learning that would grant her credit and place her back in a tie with the other student. He also contacted the middle school principal to arrange for LeAnn to perform community service and obtain the necessary credit. While the Williamses were still not sure of LeAnn's standing up to the week of graduation, LeAnn was afforded the opportunity to do the extra work, received the necessary credit, and ultimately graduated number one and was co-valedictorian of her senior class.

Prior to May 16, 2001, Mr. Hardin had warned Philip that there were rumors circulating around the school about Philip and Cheryl Blackwell, a secretary at Buford, spending an inordinate amount of time together behind closed doors. Mr. Hardin told Philip the women in the office thought "there was something going on between" him and Cheryl, and instructed both Philip and Cheryl to avoid this apparently compromising situation. Around May 15 or 16, 2001, the Williamses were informed by one of LeAnn's teacher's that her permanent record showed she was ranked as number two in her class. Barbara suggested to Philip that he go see Cheryl to see if they could obtain transcripts or grade printouts to verify where LeAnn stood.

According to Philip, when he went to see Cheryl in her office, he found her distraught after a phone argument she had with her soon to be ex-husband. Philip asked Cheryl to go with him to the health room, where he could speak with her in private. He suggested Cheryl go into the bathroom to gain her composure, as he needed her help. While he was standing in the doorway to the bathroom, he heard keys rattling. Because he held documents in his hand that Cheryl had printed out concerning LeAnn's grade points and he did not want anyone to discover him with the documents, he panicked, stepped inside the bathroom, and shut the door. This occurred around 3:30 or 3:45 in the afternoon when school was out. When Mr. Hardin shook the door, Philip told him he would be out in a minute. Philip walked out into the hall, Mr. Hardin looked up and down the hall, and Cheryl came walking out about two or three minutes later. Mr. Hardin then

escorted Cheryl to his office. When Mr. Hardin later asked Philip what was going on in the bathroom, Philip told him he was there going to the bathroom, and may have told Mr. Hardin he had diarrhea. Philip admitted that this was a lie. Philip conceded he did not want to be discovered in the bathroom with Cheryl, or any other female, because he was a married man and it did not look appropriate.

Mr. Hardin testified he was looking for some supplies when he went to the health room and, as he got out his keys and opened the door, he heard a lot of noise. After entering the room, he noticed the bathroom door was closed. He reached for the handle and discovered the door was locked. He knocked on the door, and Philip indicated he was in the bathroom. Mr. Hardin walked out into the hallway and Philip then came out saying he did not feel good that day. After Philip began walking away, Mr. Hardin motioned for Dr. Jordan to come to him. He believed there was more than one person in the bathroom because of all the noise he had heard. Mr. Hardin then opened the door to the health room and knocked on the bathroom door, at which time Cheryl walked out.

Philip met with Dr. Jordan and Mr. Hardin later that afternoon in Dr. Jordan's office. Philip stated the two men "were screaming and hollering" at him saying they knew about him and Cheryl all along. Mr. Hardin testified that when confronted about what he was doing in the bathroom with Cheryl, Philip stated Cheryl had emotional problems and was upset and that he was trying to console her. Based on this incident, as well as Philip's previous record at the school, Dr. Jordan informed Philip he would "probably recommend that [Philip] be terminated." Dr. Jordan testified that after his meetings with Mr. Hardin and Cheryl and Mr. Hardin and Philip that afternoon, he discussed the matter with Superintendent Taylor.

Shortly after this incident, while Cheryl was away from work, a school secretary was looking for something relating to Cheryl's job responsibilities when she found a letter in Cheryl's desk that alluded to a romantic relationship with a co-employee. Although the letter was not signed, there were references in the letter that led Dr. Jordan to believe that it

was authored by Philip. Dr. Jordan delivered a copy of the letter to Superintendent Taylor and discussed it with him and Mr. Hardin.

On June 22, 2001, before any action was taken by the school district on Philip's employment, Philip submitted a letter of resignation. Philip informed the district he had accepted a teaching and coaching position at a high school in Charlotte, North Carolina. He started his job with that high school in mid-August of that year.

During the next school year, the Williamses' son, Clark, experienced a problem at Buford. One day, Clark became ill during school. He was given some medicine and went to the health room. During this time, Clark missed a Spanish test. That day was a pep rally day. Clark went to see about retrieving his book bag, and as he was returning to the health room, one of the office staff instructed him to go to the gym. While in the gym, Clark was asked to participate in a slam-dunk contest by standing on the court while another attempted to dunk the ball. After doing this, he was confronted by his Spanish teacher about missing the test but participating in the rally. Clark was initially given a zero on the test. Philip maintained that Dr. Jordan and Mr. Hardin instructed the teacher to give Clark a zero. However, Clark subsequently was able to convince his teacher he was ill that day and he was allowed to take the test, ultimately making a one hundred on it.

Philip and Barbara individually filed suit against the school district, Dr. Jordan, and Mr. Taylor, and their actions were subsequently consolidated. The Williamses' complaints loosely allege causes of action for slander, intentional infliction of emotional distress, breach of contract, intentional interference with contractual relations, and loss of consortium.

Respondents moved for summary judgment as to all of the claims. After a hearing, the trial court granted Respondents' motion, finding, among other things, (1) there was no evidence of any publication by any of the respondents alleging Philip committed adultery, (2) the Williamses offered insufficient evidentiary support for their allegation that the respondents acted intentionally or recklessly to inflict severe emotional distress upon them, the record was devoid of any evidence the

Respondents' actions were so extreme and outrageous as to exceed all possible bounds of decency and regarded as atrocious and utterly intolerable in a civilized society, and there was no evidence of record the Williamses suffered emotional distress so severe that no reasonable person could be expected to endure it, (3) the claims for breach of contract and intentional interference with contractual relations failed as a matter of law as the record demonstrates Philip voluntarily resigned and he failed to pursue and exhaust his administrative remedies,[2] (4) Barbara's loss of consortium claim was derivative and failed since Philip had no claim against Respondents, and (5) Barbara's claim for slander was similarly barred as she offered no evidence of the publication of a slanderous statement about her by the Respondents.

The only issue raised on appeal is whether the trial court erred in granting summary judgment as to the Williamses' causes of action for slander, outrage, and loss of consortium against Dr. Jordan. Thus, the Williamses do not appeal from the granting of summary judgment to Superintendent John Taylor and the Lancaster County School District as to any of their claims. Nor do they appeal the dismissal of all the contract-related claims. Accordingly, the only issues remaining on appeal involve the Williamses' claims for slander, intentional infliction of emotional distress, and loss of consortium against Dr. Jordan alone.

## STANDARD OF REVIEW

"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). "A motion for summary judgment shall be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Rule 56(c), SCRCP). When reviewing the grant of a summary judgment motion, this court applies the same standard which governs the trial court under Rule 56(c),

---

2. Barbara Williams withdrew her contract claims at the summary judgment hearing.

SCRCP. *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). In determining whether a genuine issue of fact exists, the evidence and all factual inferences drawn from it must be viewed in a light most favorable to the nonmoving party. *Sauner v. Pub. Serv. Auth. of South Carolina*, 354 S.C. 397, 404, 581 S.E.2d 161, 165 (2003).

## LAW/ANALYSIS

### I. Slander

██ The Williamses contend the trial court erroneously granted summary judgment on their claim of slander against Dr. Jordan. They contend there is evidence in the record that Dr. Jordan and John Hardin accused Philip of committing adultery with Cheryl in separate meetings they had with Philip and Cheryl on the afternoon of the incident. They contend the meetings occurred after school had ended for the day, no other persons were present at the meetings, and no other persons were in the area of the meetings. They further maintain the record shows rumors of adultery on the part of Philip were immediately spread throughout the community. Accordingly, they argue the only individuals who had knowledge of the bathroom incident were Dr. Jordan and Mr. Hardin, and this is indirect evidence of publication of a slanderous statement. They further assert that the unsigned letter found in Cheryl's desk was "published to person or persons known and unknown to [the Williamses]," the "[p]ublication was accomplished by transmitting the 'letter' by telefacsimile," and the letter was discussed between John Taylor and Dr. Jordan. The Williamses thus contend there is evidence of record to show Dr. Jordan published defamatory and slanderous communications about them. We disagree.

██ The tort of defamation allows a complaining party to recover for injury to his reputation as the result of a false communication to others about him, made by the defendant. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 508, 506 S.E.2d 497, 501 (1998). "Slander is a spoken defamation, while libel is a written defamation or one accomplished through actions or conduct." *Id.* In order to prove defamation, a party must show: (1) a false and defamatory statement was made; (2) the unprivileged publication of the statement to

a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose,* 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002).

We agree with the trial court that the record is devoid of any evidence of any publication of a slanderous statement made by Dr. Jordan as to either Philip or Barbara Williams.[3] When asked if he knew whether Dr. Jordan had ever discussed a purported affair between him and Cheryl, other than with Philip in Dr. Jordan's office, Philip responded, "I have no knowledge of that." Further, in referring to the rumors concerning him and Cheryl, Philip stated, "I don't know how it got on the street, but it's out there." When asked if he could name any person that would testify to any employee of the District telling them that he was having an affair with Cheryl, Philip indicated he knew of a Board member who referenced the alleged affair in a poem, but other than that, he could not say any employee of the District had said he was having an affair with Cheryl.

Also, there is evidence of record that numerous other employees, as well as possibly a parent and some students, were in the office area right after Philip and Cheryl were discovered locked in the bathroom and Cheryl was escorted to the office. These individuals at least had an opportunity to gain knowledge of the incident at that time. Further, at least two other office personnel became aware of the bathroom incident when one of the employees came back into the school looking for Cheryl and saw Cheryl walking down the hall with Mr. Hardin and Dr. Jordan, and the next day told the other employee that Cheryl and Philip had been found in the health room bathroom together. There is also evidence Superintendent Taylor was informed of the bathroom incident that afternoon. Finally, Philip acknowledged that Mr. Hardin informed him at some time prior to the bathroom incident that others in the school office thought there was something going

---

3. The Williamses have failed to allege any slanderous statement concerning Mrs. Williams and the record is devoid of any such statement. *See Burns v. Gardner,* 328 S.C. 608, 615, 493 S.E.2d 356, 359–60 (Ct.App.1997) (finding defamatory statement must be shown to be about the plaintiff or be such that the person hearing it will be able to understand the statement refers to the plaintiff).

on between Cheryl and Philip and these employees had been talking about it. Deposition testimony from other school employees confirmed that rumors had circulated among staff as well as students at the high school about a possible romantic relationship between Philip and Cheryl prior to the bathroom incident.

As noted, the Williamses only challenge the granting of summary judgment to Dr. Jordan. Based on the evidence of record, there were numerous individuals who were aware of the bathroom incident besides Dr. Jordan. Any one of those people could have been responsible for the rumor of an illicit relationship between Philip and Cheryl. The record simply does not support the Williamses' assertion that the only individuals who had knowledge of the incident were Dr. Jordan and John Hardin. Further, the Williamses have conceded that John Hardin had knowledge of the incident. Thus, the rumors cannot be said to have only been possibly attributable to Dr. Jordan, and the Williamses' argument concerning indirect evidence fails.

The Williamses also appear to argue Dr. Jordan was responsible for the publication of the letter found in Cheryl's desk because the evidence shows this letter was faxed "to person or persons known and unknown," and publication was thus accomplished by tele-facsimile. However, the Williamses failed to point to any evidence establishing that Dr. Jordan was responsible for faxing the letter. The Williamses also fail to name anyone to whom the letter was faxed. Without an unprivileged publication to a third party, the Williamses' claim for slander fails.

Accordingly, we find the Williamses' claim for slander fails as a matter of law, as they cannot establish a defamatory statement published by Dr. Jordan to a third party. *See Moody v. McLellan*, 295 S.C. 157, 163–64, 367 S.E.2d 449, 453 (Ct.App.1988) (affirming the trial court's grant of summary judgment for defamation claim due to appellant's failure to come forward with evidence respondent actually made the alleged statements). Because the Williamses cannot show the publication of a defamatory statement by Dr. Jordan, we decline to address the rest of the elements for defamation, including whether Philip Williams, as athletic director, teach-

er, and head football coach, is a public figure required to establish constitutional malice.

## II.  Intentional Infliction of Emotional Distress

Next, the Williamses maintain the trial court erred in granting summary judgment on their claim for intentional infliction of emotional distress.  They point to the incidents involving LeAnn and Clark in contending Dr. Jordan's conduct amounted to intentional infliction of emotional distress.  We disagree.

South Carolina recognizes that "one's wilful, malicious conduct proximately causing another's emotional distress may be actionable" as intentional infliction of emotional distress or the tort of outrage.  *Ford v. Hutson,* 276 S.C. 157, 161, 276 S.E.2d 776, 778 (1981).  In order to state a claim for intentional infliction of emotional distress, a party must establish (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.  *Bergstrom v. Palmetto Health Alliance,* 358 S.C. 388, 401, 596 S.E.2d 42, 48 (2004).  Initially, it is for the trial court to determine whether the defendant's conduct may be considered so extreme and outrageous as to permit recovery, and only where reasonable minds might differ should the issue be submitted to the jury.  *Hainer v. Am. Med. Int'l, Inc.,* 320 S.C. 316, 324, 465 S.E.2d 112, 117 (Ct.App.1995), *aff'd as modified,* 328 S.C. 128, 492 S.E.2d 103 (1997).

We find the Williamses have failed to present any factual allegations to support a cause of action for intentional infliction of emotional distress.  As far as the situation with LeAnn's class ranking, we find no merit to the Williamses' claim.  While both Philip and Barbara testified to problems in dealing with Dr. Jordan on the matter, Dr. Jordan testified, and there is no evidence to the contrary, that he contacted the

District office requesting LeAnn be allowed to take the service-learning course that would grant her credit and place her back in a tie with the other student. He also contacted the middle school principal to arrange for LeAnn to perform work to obtain the necessary credit for the service-learning course. Additionally, it is undisputed that when LeAnn graduated she was ranked first in her class and was co-valedictorian. As to the incident involving Clark, the record shows, once Clark explained the matter to his teacher, he was allowed to take the test and ultimately made a one hundred on it. We agree with the trial judge that (1) there is insufficient evidence of an intentional or reckless act by Dr. Jordan which inflicted severe emotional distress, (2) the record is devoid of evidence of extreme or outrageous conduct by Dr. Jordan exceeding all possible bounds of decency and atrocious and utterly intolerable in a civilized community, and (3) there is no evidence the Williamses suffered emotional distress so severe that no reasonable man could be expected to endure it. There is simply nothing in Dr. Jordan's actions that could be characterized as extreme and outrageous; as exceeding possible bounds of decency; or which might be regarded as atrocious and utterly intolerable in a civilized community.

## III. Loss of Consortium

Finally, the Williamses maintain the trial court erred in granting summary judgment as to their respective claims for loss of consortium. They allege Dr. Jordan's actions caused them emotional strain and disrupted their marital life. We find no error.

Although Philip brought a claim for loss of consortium in his complaint, the trial court did not rule on the issue and Philip failed to make a motion pursuant to Rule 59(e), SCRCP to alter or amend the judgment on that ground. Therefore, the issue is not preserved for our review. *See Harkins v. Greenville County,* 340 S.C. 606, 620, 533 S.E.2d 886, 893 (2000) (stating an issue must have been ruled upon by the trial court to be preserved for appellate review); *Noisette v. Ismail,* 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (holding an issue is not preserved where the trial court does not explicitly rule on a question and the appellant fails to make a Rule 59(e), SCRCP motion to alter or amend the judgment on that ground).

As to Barbara's claim, while her action for loss of consortium is not derivative, we find the trial court properly granted summary judgment on this claim as well. Our supreme court has recognized that a loss of consortium claim is not derivative, but is a distinct, independent cause of action. *Barnette v. Adams Bros. Logging, Inc.*, 355 S.C. 588, 595 n. 4, 586 S.E.2d 572, 576 n. 4 (2003) (citing *Preer v. Mims*, 323 S.C. 516, 521, 476 S.E.2d 472, 474 (1996)). However, there must be some intentional or tortious conduct for a loss of consortium claim to stand. *See* S.C.Code Ann. § 15–75–20 (2005) (providing "[a]ny person may maintain an action for damages arising from an intentional or tortious violation of the right to companionship, aid, society, and services of his or her spouse"). Barbara's claim for loss of consortium fails for the same reason the claims for slander and outrage fail, namely, her inability to establish evidence to support the elements required under the claim. First, Barbara fails to delineate any specific actions by Dr. Jordan amounting to an intentional or tortious violation of her rights. Even if we were to assume she is relying on the acts complained of in the Williamses' slander and outrage claims, we have already determined there is insufficient evidence of any slanderous or outrageous conduct by Dr. Jordan in these matters. We simply find no evidence of record to support Barbara's assertion that Dr. Jordan committed an intentional or tortious injury to her right to the companionship, aid, society, and services of her husband.

## CONCLUSION

Viewing the evidence and all factual inferences that can be drawn therefrom in the light most favorable to the Williamses, we find there is no genuine issue as to any material fact and Dr. Jordan is entitled to a judgment as a matter of law on the slander, intentional infliction of emotional distress, and loss of consortium claims. Accordingly, the decision of the trial court is

**AFFIRMED.**

GOOLSBY, and STILWELL, JJ., concur.