760 S.E.2d 121

Richard A. **FISHER**, Platte B. Moring, Jr., Trustee of the Platte B. Moring, Jr. Living Trust dated March 13, 2001; Marianne Kochanski, and Jim H. Markley, III, Individually, and in a Representative Capacity on Behalf of All Persons Similarly Situated Who Own Units in Buildings C and D of the Shipyard Village Horizontal Property Regime; Robert A. Wright, Mary Beth C. Wright, H. Allen Wright, Joyce Y. Wright and Carolyn

L. Wright; Carmen J. Savoca, Ann D. Savoca, William John Savoca and Donna S. Strom; James T. Hunter and Mary D. Hunter; Dwain C. Andrews; WWS, LLC, a South Carolina Limited Liability Company; Donald L. Henson and Sandra L. Henson; Allen M. Funk; Norman J. Rish and Mary T. Rish; Angela M. Markley; Walter C. Worsham and Carolyn W. Worsham; Enrico S. Piraino and Giusto Piraino; Otis T. Harrison and Rose C. Harrison; James E. Newman, Jr.; Brenda E. Fisher and Joseph R. Canning and Kathleen B. Canning; James D. Reynolds, Jr.; Fuller Family, LLC; Richard T. White and Rory L. White; Propst and Dawson, LLC; Litchfield Quarters, LLC, and Larry O. Snider and Paula D. Snider; William C. Hammond, Jr., Living Trust and the Shawn S. Hammond Living Trust; GAB IV, LLC, a Virginia Limited Liability Company; Robert C. McBride and Susan R. McBride, Trustees of the Robert C. McBride Family Trust u/d/t July 24, 2008, and Susan R. McBride and Robert C. McBride, Trustees of the Susan R. McBride Family Trust u/d/t July 24, 2008; Evelyn J. Valuska; Barbara W. Beymer; Montrose Associates, LLC; Harry L. Belk and Jan C. Belk; Dennis E. Barrett and Wilma J. Barrett; First Family Properties, Inc., Cynthia L. Jones, Sandra D. Huggins and Margaret S. Dover, Thomas Franklin Huggins, Frank S. Krouse and Barbara T. Krouse, Judith W. Mill, William Mill and Susan Mill, Gene R. Riley and Patricia C. Riley, Harold LeMaster and Patti LeMaster; Joseph P. Heaton and Frances H. Heaton; Robert N. Kelly; H.S. Keeter and Sandra C. Keeter; Brian R. Nisbet Trust Agreement dated November 16, 1998 and Mary M. Nisbet Trustee of the Mary M. Nisbet Trust Agreement dated November 16, 1998, Dorothy Jean Foster; Captains Quarters D–24 Association of Owners, Inc., Michael H. Sanders and Rebecca H. Sanders, Ruth Gray Wheliss, David B. Shivell and Nicki M. Shivell, Debra B. Leeke, Joseph Alan Capobianco and Lara Serro, Sharon Gibson Daniel, Gary C. Andes and Andrea W. Andes, Jay Hendler and Laura Hendler, Joy P. McConnell, Charles W. Fortner, Judith C. Woodson, Warren W. Riggs and Charles G. Martin, Riggs Ventures, LLC, and SGS Beach Partners, LLC; Morgan J. Mann and Angela M. Mann; Michael Cameron Foster, Sr. and Laura Lee Foster; Captains Quarters Unit D–31 Association of Multiple Ownerships, Inc., Evelyn Gail Earnest, Francis G. Thomson and Arleen S. Thomson, Robert W. Dalton, Red Oak Limited Partnership, William R. McKeown and Margaret A. McKeown, Norman K. Moon and Barbara W. Moon,

David T. McGill and Carol G. McGill, Rick L. Bledsoe and Susan H. Bledsoe, Geoffrey A. Wienke and Pamela L. Wienke, A. Donald Ross, III and Nancy Kay Ross, Dennis J. Straw and Roxanne B. Straw, and Resort Investments of Litchfield, LLC; Georgia M. Pruitt and Howard M. Pruitt, Jr.; Jean T. Blaylock; William C. Covington, Jr. and Donna C. Covington; Litchfield Captain's Quarters, LLC; James A. Schubert and Laraine C. Schubert; Daniel P. Duvall and Mary Lynn Duvall; Victor A. Medina and Melinda Leigh Medina; Judy P. Hamer; Boyce F. Miler and Carole L. Miller, Raymond A. Shingler and Louise O. Shingler, Paul Larry Barnette and Carol Jane Barnette, James R. Walker and Erika T. Walker, Kathy W. Underwood, Andrew J. Wingo, Jr. and Susan A. Wingo, Melanie S. Franklin, Lois E. Cooley, Truseee of the Lois E. Cooley Living Trust, B. Lee Smith and Margaret H. Smith, Jason A. Underwood, Camilla J. Wilson; Stewart South, LLC; Quarter South, LLC; Steven H. Frame and Kay B. Frame, Respondents.

v.

SHIPYARD VILLAGE COUNCIL OF
CO–OWNERS, INC., Appellant.

Shipyard Village Council of Co–Owners,
Inc., Third–Party Plaintiff,

v.

Cincinnati Insurance Company, Travelers Insurance Company, Companion Property & Casualty Insurance Company, Philadelphia Insurance Company, Zurich American Insurance Company, American Guarantee and Liability Ins. Co., St. Paul Fire and Marine Insurance Company, and Illinois National Insurance Company, Third–Party Defendants.

Appellate Case No. 2012–213634.

No. 5241.

Court of Appeals of South Carolina.

Heard Feb. 20, 2014.

Decided June 25, 2014.

Carlyle Richardson Cromer and R. Wayne Byrd, both of Turner Padget Graham & Laney, PA, of Myrtle Beach, for Appellant.

Howell V. Bellamy, Jr., and Howell Vaught Bellamy, III, both of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A. of Myrtle Beach, for Respondents.

KONDUROS, J.

The Shipyard Village Council of Co–Owners, Inc. (the Council) appeals the circuit court's grant of partial summary judgment to owners of condominiums within the development in the case involving faulty windows and sliding doors. The Council argues it did not have a duty to investigate, the business judgment rule should have applied, and a jury could have found it did not breach any duty. We affirm in part, reverse in part, and remand.

**FACTS/PROCEDURAL HISTORY**

The condominium development Shipyard Village Horizontal Property Regime (Shipyard Village) in Pawleys Island was established in 1982 pursuant to the recording of the Master Deed. The Council was incorporated to administer the affairs in accordance with the Bylaws through a Board of Directors (the Board). Shipyard Village was built in two phases. Phase I was approved for final occupancy in 1982 and contained two buildings, A and B. Phase II was submitted to condominium ownership in 1998 and was comprised of Buildings C and D.

Section 3.6(c) of the Master Deed provides that a unit's balcony doors including its frame and "window glasses, screens, frames, and casings" are part of each unit. Section 6.1 of the Bylaws provides the manager or the Board is responsible for the maintenance, repair, and replacement of the common elements. Section 6.2 of the Bylaws specifies that unit owners (Co-owners) are responsible for the maintenance and repair of their units. Section 5.6 of the Master Deed states maintenance, repair, and replacement of the common elements are the Board's responsibilities "except in the case of the negligence of a Co-owner ..., and in the event of such negligence, such expenses of a portion thereof may be assessed as an individual assessment." Additionally, section

12.1 of the Master Deed indicates that if regime property is damaged due to "neglect, willful act[,] or abuse" of a Co-owner and insurance proceeds are insufficient to cover the cost of the damage, the deficiency amount "shall be charged to such Co-owner as an individual assessment." The Bylaws state in section 6.4 that all maintenance, repair, and replacement expenses are common expenses except when those expenses are not fully reimbursed by insurance proceeds and are necessitated by the failure of a Co-owner to perform the maintenance required by the Bylaws or by the willful act, neglect, or abuse by a Co-owner, in which case they will be charged to the Co-owner as an individual assessment. The Master Deed does not list window flashing as one of Co-owners' responsibilities but window frames and casings are included as Co-owners' responsibilities.

Over the years, Buildings A and B experienced leaks at the windows and balcony doors. In 1993, Procon Waterproofing, Inc., which had waterproofed the buildings in 1990, informed a management company that following its preliminary inspection of the concrete structural slabs of Buildings A and B, it recommended "a structural engineer further evaluate the cracking and spalling [that] is occurring in the pre-cast slabs and beams." In 1994, Procon found that all the work it completed in 1990 was performing as intended with no problems. It noted that for the ocean-front windows, "the metal end stop bead associated with the stucco system which was installed during the original construction over each floor band are beginning to deteriorate and rust." The Council had Procon replace the corroded metal casing beads.

At the June 15, 1999 Board meeting, the Board decided to "notify all the [Co-]owners and inform them that they are responsible for their threshold and window frame on their unit." The property manager sent a letter dated August 11, 1999, to all Co-owners in Buildings A and B stating "the waterproofing of the balcony thresholds and windows are the responsibility of the unit owners." The letter provided Co-owners could waterproof their balcony thresholds and windows for $737.50. In 1999, Henderson Waterproofing performed some stucco and concrete repairs to Buildings A and B. Bobby Warner, the Council's maintenance supervisor at that time, observed the work and did not believe the damage

to the building was as severe as Henderson did and did not think an engineer was needed to assess the buildings.

In 2002, the Council hired McGee Consulting Associates to study the windows for Buildings A and B. It determined some of the windows leaked when sprayed by a hose. However, the hose testing failed to comply with the published standards for window leak testing. The hose test indicated "water channels down both sides of the windows, which starts at the top floor windows and works its way to the ground. The water intrusion had caused some of the wood framing to deteriorate due to wood-rot." During the investigation, McGee discovered some of the windows had been replaced after Hurricane Hugo, in 1989, and appeared to be residential instead of commercial and prefabricated instead of custom made. Because the windows were prefabricated, they were smaller than the opening and wood framing had been installed to fill the gaps. The replacement windows were also less thick than the original windows. An attorney for the Board noted issues with the statute of limitations in pursuing any action for deficiencies in the replacement windows and the original developer had filed bankruptcy in 1993.

The following year, the Council hired Keystone Construction to examine the leaks at the windows and it determined the water was leaking through the stucco instead of the windows. Keystone informed the Council the lack of window flashing was part of the cause of the leaking. It further found the windows were improperly sized and poorly installed and stucco had been used to fill the gaps around the windows.

In 2004, the owners of a unit in Building B, Ben and Katie Morrow, were having water intrusion problems, and in 2005, they replaced their windows. They continued to experience leaks afterwards and hired an architect and an engineer to investigate the cause of the leaking. The architect found "there is water migration through the exterior wall that is not related to the window sill, jamb[,] or header." The new site maintenance supervisor, Richard Bennett, looked into the issue and found sealant joint failures at the window-stucco interface along with cracked stucco could have been causing the problems. The Morrows' engineer reported at a board meeting in 2006 that repairing one window would not solve the

leak issue and an entire vertical stack of windows needed to be removed, flashed, and replaced at the same time.

Because the Board was concerned about the uniformity of new windows, complying with codes, stucco being damaged during replacement, individual owners' ability to procure competent contractors, and the need to replace entire stacks at the same time, in 2006, it considered amending the Master Deed to include windows and sliding doors as common elements. The Board received a proposal from Pro–Tec Finishes, Inc. to replace all of the windows in Buildings A and B for a total of $2.48 million. At the annual members' meeting on April 15, 2006, 71.94% of the Co-owners voted on whether to amend the Master Deed to include the window and sliding doors. To pass the amendment, 66.68% was needed to vote in favor of it, but only 63.59% voted for it. The Board determined ninety units had voted in favor of the amendment, eleven had voted against it, and thirty-nine had not voted. The Council decided to leave voting open for thirty days to allow the Co-owners who did not voted at the meeting or by proxy to vote.[1] Because over 80% of Co-owners voted in favor of the amendment after leaving the voting open, the Board believed the amendment had passed. An amendment to the Master Deed recorded on October 16, 2006, added "[t]he Limited Common Elements shall also include the window glasses, screens, frames and casings" and deleted the language indicating the windows were a part of the unit. On November 14, 2007, another amendment was recorded, stating this amendment was to correct and clarify the previously recorded amendment, which omitted adding the sliding glass doors to the common elements.

In 2006, the Board hired Schneider and Associates, Inc. to investigate the water problems for Buildings A and B. Schneider found that considering the buildings were over thirty years old, it observed better than average building envelope performance. Schneider performed destructive testing on the Morrows' unit and discovered " 'the stack' of units was leaking from top-to-bottom at the jamb and sill termi-

---

1. Section 1.5 of the Bylaws states, "Any action which may be taken by a vote of the Co-owners may also be taken by written consent to such action signed by all [C]o-owners entitled to vote."

nations. The existing conditions rely on the window-wall's frame configuration to 'turn' the water to the exterior. The spandrel, formed by the slab edge, is insufficient to accomplish this alone." Schneider recommended enlarging the spandrel's vertical dimension to allow space for separate flashing assemblies. Schneider oversaw repairs for two units in Building A, but the Board was dissatisfied with its performance and lack of progress.

In August of 2007, the Board hired MEC Engineering Services, Inc. to oversee the remainder of renovations to Buildings A and B. The Board requested MEC procure at least three bids from contractors for the repairs.

On April 19, 2008, the Board reported at the annual members' meeting Buildings A and B needed extensive repairs. The Board informed the members the cost would range between $12 and $13 million and the Co-owners would be charged by special assessment. Some Co-owners of units in Buildings C and D, contacted an attorney, who sent a letter to the Board asserting the special assessment was invalid because the 2006 amendment was not properly approved and accordingly the cost of replacement or repairs of windows and sliding doors were the responsibility of the individual Co-owners.

In July 2008, HICAPS presented to the Board that it had identified two primary problems for Buildings A and B. The first problem was the structural concrete was failing due to water and salt intrusion and the reinforcing steel's corrosion. The other problem was the building envelope was not weather tight, which allowed water to enter the structure and caused wood to rot in walls framing the windows and sliding doors. Additionally, the paint sealer was at the end of its lifespan as were the windows, which were failing.

The Board became displeased with MEC and hired Sutton–Kennerly & Associates, Inc. along with Spectrum Engineering Services, Inc. to review MEC's reports, proposals, drawings, and bid specifications. Sutton–Kennerly believed the repairs could be completed at a lower cost than MEC had specified. It also thought some of the proposals and drawings lacked sufficient details and did not agree with some of the proposed repair methods. The Board decided to discontinue MEC's

services. Spectrum presented the Board with a report noting failures to the roof system, façade, edge beams, soffits, concrete, expansion joints, horizontal surfaces, and HVAC anchorage. Spectrum reported that rainwater was penetrating the roof, the stucco, lanai slabs, floor beams, and hollow core slabs. Spectrum found the "windows and doors have poor to nonexistent flashing to prevent wind driven rain from getting into the units."

In January 2009, the Board requested Sutton–Kennerly to perform tests and investigate to determine the full scope of repairs required for Buildings A and B and supply a cost estimate. On February 16, 2009, the Board hired Sutton–Kennerly to draft designs for repairs and solicit bids.

On January 29, 2009, some Building C and D Co-owners brought suit against the Council for breach of the Master Deed's covenants and restrictions, injunctive relief, and declaratory judgment due to the recording of the 2006 amendment making windows and sliding doors common elements. Due to the challenge of the 2006 amendment, on March 21, 2009, the Board called a special membership meeting to revote on the amendment. Only 48.31 % voted in favor of the amendment, meaning the Co-owners were still responsible for the unit windows and sliding doors.

In July 2009, the Council notified the Co-owners that repairs would occur for Building B from September 2009 through May 2010 and from September 2010 to May 2011 for Building A. The repairs were estimated to cost $10,944,468. The Council wished to finance the repairs through a special assessment. The proposed assessment was $88,398 per unit for Buildings A and B; $64,868 per unit for three-bedroom units in Buildings C and D; and $68,471 for four-bedroom units in Building C and D. The assessments for Buildings A and B covered the cost to replace their windows and doors. The Co-owners voted on August 1, 2009, on the special assessments. To pass the assessments, 50% plus one vote was needed, and only 44.26% voted in favor. Council informed the members the repairs would be incorporated into the 2010 and 2011 operating budgets and would be billed monthly to the Co-owners in addition to their regular assessments.

On October 7, 2009, more Building C and D Co-owners (Respondents) filed a new suit, alleging negligence and gross negligence, negligent and gross negligent misrepresentation, breach of fiduciary duty, and breach of the Master Deed and requesting a declaratory judgment, injunctive relief, specific performance, and judicial dissolution of the Council. This suit was consolidated with the prior suit. The Council hired a professional engineer, J. Lawrence Elkin, with experience in diagnostic evaluations, building repair design, and construction project management to inspect the premises and analyze the documents from the former construction companies and consultants that had inspected and given opinions on the conditions of Buildings A and B. He noted "[t]he need for the $11,000,000 assessment is more directly associated with the fact that the facility is located ocean front and was constructed nearly 30 years ago." He further stated "similarly aged and located properties undergo major rehabilitations every 25 to 30 years." Elkin opined:

> The [Board] enlisted the assistance of technical experts and consultants to provide them guidance as to the condition of Buildings A & B. The [Board] acted in accordance with their recommendations. At times these recommendations were conflicting; the [Board] made choices based on the best information at [its] disposal and within the constraints of [its] budgets.

On May 4, 2012, Respondents moved for summary judgment or partial summary judgment on their negligence and breach of fiduciary duty causes of action. Following a hearing, the circuit court granted Respondents' partial summary judgment motion on the issues of duty and breach for the negligence claim. It determined the Bylaws and Master Deed impose affirmative duties on the Board to enforce, investigate, and correct known violations of the Master Deed, the Bylaws, and South Carolina Horizontal Property Act (the Act). The court further found the Council breached its duty to investigate the substantial evidence in the record that reasonably showed that Co-owners had neglected the maintenance of their leaking windows and sliding glass doors, which allegedly caused damages to the common elements of Buildings A and B. The circuit court found the business judgment rule was not applicable because the Master Deed, Bylaws, and Act all governed

the Board's actions. The circuit court further determined the Council was precluded from asserting the business judgment rule based on its lack of good faith in enforcing the 2006 amendment after June 2008. The court noted that whether the leaking windows and doors caused any damage is for the jury to decide. This appeal followed.

## STANDARD OF REVIEW

The purpose of summary judgment is to expedite the disposition of cases not requiring the services of a fact finder. *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). When reviewing the grant of a summary judgment motion, this court applies the same standard that governs the trial court under Rule 56(c), SCRCP; summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). "In a negligence case, where the burden of proof is a preponderance of the evidence standard, the non-moving party must only submit a mere scintilla of evidence to withstand a motion for summary judgment." *Bass v. Gopal, Inc.*, 395 S.C. 129, 134, 716 S.E.2d 910, 912 (2011) (citing *Hancock v. Mid–South Mgm't Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009)). In determining whether a genuine issue of fact exists, the evidence and all reasonable inferences drawn from it must be viewed in the light most favorable to the nonmoving party. *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 404, 581 S.E.2d 161, 165 (2003).

## LAW/ANALYSIS

### I. Duty to Investigate

■ The Council contends the circuit court erred in finding it had a duty to investigate to determine whether to assess individual Co-owners for the damage to the common elements. It asserts the Master Deed and Bylaws do not contain such a duty.[2] We disagree.

---

2. The Council also asserts that if the circuit court granted summary judgment on the fiduciary duty issue, it was error. Respondents did move for summary judgment on the issue of fiduciary duty in addition to on its breach of contract and negligence causes of action. The order only mentions a fiduciary duty in passing and does not make specific rulings on the issue. The circuit court states its grant of summary

"In a negligence action, a plaintiff must show the (1) defendant owes a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) plaintiff suffered an injury or damages." *Sabb v. S.C. State Univ.*, 350 S.C. 416, 429, 567 S.E.2d 231, 237 (2002). "An essential element in a cause of action based upon negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Platt v. CSX Transp., Inc.*, 388 S.C. 441, 445, 697 S.E.2d 575, 577 (2010). "In a negligence action, the court must determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff." *Faile v. S.C. Dep't of Juvenile Justice*, 350 S.C. 315, 334, 566 S.E.2d 536, 545 (2002).

When master deeds and bylaws show a homeowner's association has the obligation to maintain the common elements, the association has a duty to pursue a recovery for any alleged construction defects in the common elements. *Queen's Grant Villas Horizontal Prop. Regimes I–V v. Daniel Int'l Corp.*, 286 S.C. 555, 556, 335 S.E.2d 365, 366 (1985).

Section 6.1 of the Bylaws provides the manager or the Board is responsible for the maintenance and repair of the common elements. Section 6.2 of the Bylaws provides that "the Units shall be maintained in good condition and repair by their respective Co-owners." Section 6.3 states:

> In the event that any Co-owner fails to perform the maintenance required of him by these Bylaws or by any lawful Regulation, and such failure creates or permits a condition which is hazardous to life, health, or property, or which unreasonably interferes with the rights of another Co-owner, or which substantially detracts from the value or

---

judgment was only on the issues of duty and breach, presumably for the negligence cause of action. To the extent the circuit court did grant summary judgment on the issue of fiduciary duty, it is reversed. *See O'Shea v. Lesser*, 308 S.C. 10, 15, 416 S.E.2d 629, 632 (1992) ("We have never imposed the high standard of fiduciary duty on planned community organizations, such as the Board, which are vested with the discretion to ensure that proposed modifications to residential property enhance the entire community. Instead, under the correct standard, the Board has a duty to exercise judgment reasonably and in good faith." (footnote omitted)).

appearance of the Regime Property, the Board ... shall, after giving such Co-owner reasonable notice and opportunity to perform such maintenance, cause such maintenance to be performed and charge all reasonable expenses of so doing to such Co-owner by an Individual Assessment.

The Bylaws state in section 6.4 that all maintenance, repair, and replacement expenses are common expenses except when those expenses are not fully reimbursed by insurance proceeds and are necessitated by the failure of a Co-owner to provide maintenance required by the Bylaws or by the willful act, neglect, or abuse by a Co-owner, in which case they will be charged to the Co-owner as an individual assessment.

The circuit court properly granted Respondent's partial summary judgment motion on whether the Council had a duty to investigate. The Council is charged with maintaining the common elements. Should a problem arise with those elements, as did here, the Council is responsible for pursuing any responsible parties, whether they are Co-owners or contractors or the developer. Although some problems' cause may be obvious, here, ample evidence supports different causes. For Council to be able to perform its duty to try to recover from the responsible parties, it must first find out who caused the problem. Accordingly, even though the Bylaws do not specifically state the Council had a duty to investigate, the duties created by the Bylaws and South Carolina law also support a duty to investigate who is responsible for damage to the common elements. Therefore, the circuit court did not err in granting summary judgment on the issue of duty.

## II. Business Judgment Rule

The Council maintains the circuit court erred in determining its conduct should not be judged by the business judgment rule. It argues the business judgment rule applies even when bylaws, the regime act, and a master deed govern conduct. Further, it contends the circuit court erred in finding its conduct was *ultra vires* and thus the business judgment rule did not apply. Additionally, it asserts that even if it had committed an *ultra vires* act, that does not prohibit the business judgment rule from applying to *intra vires* actions. We agree.

■■ "In a dispute between the directors of a homeowners association and aggrieved homeowners, the conduct of the directors should be judged by the 'business judgment rule' and absent a showing of bad faith, dishonesty, or incompetence, the judgment of the directors will not be set aside by judicial action." *Goddard v. Fairways Dev. Gen. P'ship*, 310 S.C. 408, 414, 426 S.E.2d 828, 832 (Ct.App.1993); *see also Dockside Ass'n v. Detyens*, 294 S.C. 86, 87, 362 S.E.2d 874, 874 (1987) ("[T]he business judgment rule precludes judicial review of actions taken by a corporate governing board absent a showing of a lack of good faith, fraud, self-dealing[,] or unconscionable conduct."); *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 599, 538 S.E.2d 15, 25 (Ct.App.2000) ("Under the business judgment rule, a court will not review the business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith." (internal quotation marks omitted)). "[T]he burden of proving good faith is not on the governing board; the burden of proving a lack of good faith is borne, rather, by those challenging the board's actions." *Dockside Ass'n*, 294 S.C. at 87, 362 S.E.2d at 874.

■■ "[A] corporation may exercise only those powers which are granted to it by law, by its charter or articles of incorporation, and by any bylaws made pursuant thereto; acts beyond the scope of the powers so granted are *ultra vires.*" *Seabrook Island Prop. Owners Ass'n v. Pelzer*, 292 S.C. 343, 347, 356 S.E.2d 411, 414 (Ct.App.1987). The business judgment rule only applies to *intra vires* acts, not *ultra vires* ones. *Kuznik*, 342 S.C. at 605, 538 S.E.2d at 28. A homeowners association is bound to follow its covenants and bylaws and cannot defend something that violates those documents on the basis that is a reasonable alternative. *Seabrook Island Prop. Owners Ass'n*, 292 S.C. at 348, 356 S.E.2d at 414.

■■ The circuit court erred in finding the business judgment rule did not apply because the Master Deed, Bylaws, and the Act applied instead. The business judgment rule applies to actions allowed by the Master Deed, Bylaws, and Act, *intra vires* acts. The rule does not extend to actions not allowed by the Master Deed, Bylaws, and Act, *ultra vires* acts. The circuit court also erred in finding that because the Council

committed two acts it found to be *ultra vires,* the business judgment rule did not apply to any of its actions. The rule would apply to all of its actions except for *ultra vires* ones. As discussed above, the Master Deed and Bylaws did create a duty in the Council to investigate. Therefore, any investigation would be looked at under the business judgment rule to determine if the Council met its duty. Further, the burden is on Respondents to show the Council acted without good faith. However, if the Bylaws and Master Deed specified how duties should be performed, the business judgment rule would not allow the Council to deviate from those simply because what they did was reasonable.

## III. Breach of Duty

 Shipyard Village asserts the circuit court erred in determining it breached a duty to Respondents. It maintains the record contains evidence it did investigate what was responsible for the water leaking and received contradicting reports. We agree. "The question of negligence is a mixed question of law and fact. First, the court must resolve, as a matter of law, whether the law recognizes a particular duty." *Burnett v. Family Kingdom, Inc.,* 387 S.C. 183, 189, 691 S.E.2d 170, 173 (Ct.App.2010) (citation omitted). If a duty exists, the jury determines whether a breach of the duty that resulted in damages occurred. *Id.*

The record contains evidence the Council did not breach its duty to investigate. It hired many construction and engineering companies and consultants to determine what was causing the water problems. Although some evidence was presented the water was intruding through the doors and windows, other reports indicated the water was coming through the stucco and roof among other ways. The Council utilized several different construction companies over the years that had conflicting theories and solutions. The record also indicates the Board was informed by its attorneys over the years that initiating a law suit regarding the water problems would be expensive and likely unproductive. The record contains at least a mere scintilla of evidence the Council did not breach its duty to investigate. Accordingly, the circuit court erred in granting Respondents summary judgment on this issue.

## CONCLUSION

We affirm the circuit court's grant of summary judgment on the existence of a duty to investigate. Additionally, we reverse the circuit court's decision that the business judgment rule does not apply and its granting summary judgment on the issue of breach of duty and remand the case to the circuit court for trial.[3]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HUFF, J., and CURETON, A.J., concur.

---

3. We decline to rule on Respondents' additional sustaining ground that the Council had the duty to determine the cause of the "cracking and spalling in the pre-cast slabs and beams" in Buildings A and B that Procon observed in 1993 and 1994. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds."); *id.* ("An appellate court may not rely on Rule 220(c), SCACR, ... when the court believes it would be unwise or unjust to do so in a particular case.")