# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Richard A. Fisher, Platte B. Moring, Jr., Trustee of the Platte B. Moring, Jr. Living Trust dated March 13, 2001; Marianne Kochanski, and Jim H. Markley, III, Individually, and in a Representative Capacity on Behalf of All Persons Similarly Situated Who Own Units in Buildings C and D of the Shipyard Village Horizontal Property Regime; Robert A. Wright, Mary Beth C. Wright, H. Allen Wright, Joyce Y. Wright and Carolyn L. Wright; Carmen J. Savoca, Ann D. Savoca, William John Savoca and Donna S. Strom; James T. Hunter and Mary D. Hunter; Dwain C. Andrews; WWS, LLC, a South Carolina Limited Liability Company; Donald L. Henson and Sandra L. Henson; Allen M. Funk; Norman J. Rish and Mary T. Rish; Angela M. Markley; Walter C. Worsham and Carolyn W. Worsham; Enrico S. Piraino and Giusto Piraino; Otis T. Harrison and Rose C. Harrison; James E. Newman, Jr.; Brenda E. Fisher and Joseph R. Canning and Kathleen B. Canning; James D. Reynolds, Jr.; Fuller Family, LLC; Richard T. White and Rory L. White; Propst and Dawson, LLC; Litchfield Quarters, LLC, and Larry O. Snider and Paula D. Snider; William C. Hammond, Jr., Living Trust and the Shawn S. Hammond Living Trust; GAB IV, LLC, a Virginia Limited Liability Company; Robert C. McBride and Susan R. McBride, Trustees of the Robert C. McBride Family Trust u/d/t July 24, 2008, and Susan R. McBride and Robert C. McBride, Trustees of the Susan R. McBride Family Trust u/d/t July 24, 2008; Evelyn J. Valuska; Barbara W. Beymer; Montrose Associates, LLC; Harry L. Belk and Jan C. Belk; Dennis E. Barrett and Wilma J. Barrett; First Family Properties, Inc., Cynthia L. Jones, Sandra D. Huggins and Margaret S. Dover, Thomas Franklin Huggins, Frank S. Krouse and Barbara T. Krouse, Judith W. Mill, William Mill and Susan Mill, Gene R. Riley and Patricia C. Riley, Harold LeMaster and Patti LeMaster; Joseph P. Heaton and

Frances H. Heaton; Robert N. Kelly; H. S. Keeter and Sandra C. Keeter; Brian R. Nisbet Trust Agreement dated November 16, 1998 and Mary M. Nisbet Trustee of the Mary M. Nisbet Trust Agreement dated November 16, 1998, Dorothy Jean Foster; Captains Quarters D-24 Association of Owners, Inc., Michael H. Sanders and Rebecca H. Sanders, Ruth Gray Wheliss, David B. Shivell and Nicki M. Shivell, Debra B. Leeke, Joseph Alan Capobianco and Lara Serro, Sharon Gibson Daniel, Gary C. Andes and Andrea W. Andes, Jay Hendler and Laura Hendler, Joy P. McConnell, Charles W. Fortner, Judith C. Woodson, Warren W. Riggs and Charles G. Martin, Riggs Ventures, LLC, and SGS Beach Partners, LLC; Morgan J. Mann and Angela M. Mann; Michael Cameron Foster, Sr. and Laura Lee Foster; Captains Quarters Unit D-31 Association of Multiple Ownerships, Inc., Evelyn Gail Earnest, Francis G. Thomson and Arleen S. Thomson, Robert W. Dalton, Red Oak Limited Partnership, William R. McKeown and Margaret A. McKeown, Norman K. Moon and Barbara W. Moon, David T. McGill and Carol G. McGill, Rick L. Bledsoe and Susan H. Bledsoe, Geoffrey A. Wienke and Pamela L. Wienke, A. Donald Ross III and Nancy Kay Ross, Dennis J. Straw and Roxanne B. Straw, and Resort Investments of Litchfield, LLC; Georgia M. Pruitt and Howard M. Pruitt, Jr.; Jean T. Blaylock; William C. Covington, Jr. and Donna C. Covington; Litchfield Captain's Quarters, LLC; James A. Schubert and Laraine C. Schubert; Daniel P. Duvall and Mary Lynn Duvall; Victor A. Medina and Melinda Leigh Medina; Judy P. Hamer; Boyce F. Miler and Carole L. Miller, Raymond A. Shingler and Louise O. Shingler, Paul Larry Barnette and Carol Jane Barnette, James R. Walker and Erika T. Walker, Kathy W. Underwood, Andrew J. Wingo, Jr. and Susan A. Wingo, Melanie S. Franklin, Lois E. Cooley, Trustee of the Lois E. Cooley Living Trust, B. Lee Smith and Margaret H. Smith, Jason A. Underwood, Camilla J. Wilson; Stewart South, LLC; Quarter South, LLC; Steven H. Frame and Kay B. Frame, Petitioners,

v.

Shipyard Village Council of Co-Owners, Inc.,
Respondent.


Shipyard Village Council of Co-Owners, Inc., Third-
Party Plaintiff,

v.

Cincinnati Insurance Company, Travelers Insurance
Company, Companion Property & Casualty Insurance
Company, Philadelphia Insurance Company, Zurich
American Insurance Company, American Guarantee and
Liability Ins. Co., St. Paul Fire and Marine Insurance
Company, and Illinois National Insurance Company,
Third-Party Defendants.

Appellate Case No. 2014-002394

---

**ON WRIT OF CERTIORARI TO THE COURT OF APPEALS**

---

Appeal From Georgetown County
Larry B. Hyman, Jr., Circuit Court Judge

---

Opinion No. 27603
Heard November 3, 2015 – Filed January 27, 2016

---

**AFFIRMED AS MODIFIED**

---

Howell V. Bellamy, Jr., and Howell V. Bellamy, III, both of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, PA, of Myrtle Beach, for Petitioners.

Carlyle Richardson Cromer and R. Wayne Byrd, both of Turner Padget Graham & Laney, PA, of Myrtle Beach, for Respondents.

---

**Acting Justice Toal:** The underlying dispute in this case involves the repair of faulty windows and sliding glass doors in a condominium development, Shipyard Village Horizontal Property Regime (Shipyard Village), in Pawleys Island, South Carolina. Fifty co-owners of units in Buildings C & D of the development (Petitioners) appeal the court of appeals' decision reversing the trial court's finding that the business judgment rule does not apply to the conduct of the Board of Directors (the Board) of the Shipyard Village Council of Co-Owners, Inc. (the Council), and the trial court's decision granting Petitioners partial summary judgment on the issue of breach of the Board's duty to investigate. *See Fisher v. Shipyard Village Council of Co-Owners, Inc.*, 409 S.C. 164, 760 S.E.2d 121 (Ct. App. 2014). We affirm the court of appeals' decision as modified.

### FACTS/PROCEDURAL BACKGROUND

Shipyard Village was established in 1982 pursuant to the recording of its Master Deed. Bylaws were promulgated to govern the Board's administration of the Council. Phase I of Shipyard Village was completed in 1982, and consists of Buildings A and B, each of which contains forty units. Phase II was completed in 1998, and consists of Buildings C and D, each of which contains thirty units.

Evidence in the record indicates that water leaks around the windows and sliding glass doors in various units in Buildings A and B date back to 1983. Moreover—although there is conflicting evidence as to the cause—the evidence indicates that the Board knew about the leaks for years, and that the co-owners of units with leaks failed to maintain and repair their units as required by the Master Deed and Bylaws.

Section 3.6(c) of the Master Deed provides that a unit's balcony doors, including the doors' "frames, casings, hinges, handles, and other fixtures" are part of each unit. Under Section 3.7(a) of the Master Deed, the roofs and stucco exteriors of the units are common elements.

Sections 6.1 and 6.2 of the Bylaws provide that the property manager of Shipyard Village or the Board is responsible for the maintenance, repair, and replacement of the "common elements," and co-owners are responsible for the maintenance and repair of their own units. However, section 6.3 of the Bylaws provides:

> [I]f a co-owner fails to perform the maintenance required of him by [the Bylaws], and such failure creates or permits a condition which is hazardous to life, health, or property, or which unreasonably interferes with the rights of another [c]o-owner, or which substantially detracts from the value or appearance of the Regime Property, the Board [] shall, after giving such [c]o-owner reasonable notice and opportunity to perform such maintenance, cause such maintenance to be performed and charge all reasonable expense of so doing to such [c]o-owner by an Individual Assessment.

Section 6.4 of the Bylaws further states:

> The expenses of all maintenance, repair, and replacement provided by the Manager or the Board . . . shall be Common Expenses, except that when such expenses are not fully reimbursed by insurance proceeds and when they are necessitated by (1) the failure of a [c]o-owner to perform the maintenance required by these Bylaws or by any lawful Regulation or (2) the willful act, neglect, or abuse of a [c]o-owner, they shall be charged to such [c]o-owner as an Individual Assessment.

Similar to the Bylaws, Section 5.6 of the Master Deed provides that maintenance, repair, and replacement of the common elements are the Board's responsibility, and that the expenses incurred for such purposes shall be assessed as common expenses except in the case of the negligence of a co-owner.

At a board meeting on June 15, 1999, the Board discussed the responsibility for waterproofing the units' balcony thresholds (the area underneath the sliding glass doors) and window frames pursuant to the Master Deed. The Board moved to notify all co-owners that they were responsible for waterproofing their balcony thresholds and window frames, and subsequently mailed such notice to the co-owners on August 11, 1999.

A management report dated August 23, 2002, referenced the "many calls" the Board was receiving about leaking windows in Buildings A and B. The report noted that "[t]his is the owners['] responsibility and [is] very difficult for some to try to deal with getting the work done," and further stated that "[w]e are in the process of inspecting the windows and formulating a plan/price."

At some point in 2002, the Board hired McGee Consulting Association (MCA) to investigate and perform testing on the windows of Buildings A and B. The minutes from the September 27, 2002, special meeting of the Board indicate that MCA conducted water testing on some of the windows. The water testing confirmed positive water intrusion, which had caused some of the wood framing to deteriorate. In response to this information, the Council's attorney informed the Board that "there were safety issues with respect to the durability of the windows," and recommended the Board pursue legal action against the responsible parties.[1]

In response to co-owners' complaints, the Board repeatedly informed co-owners that under the Master Deed, the leaks in windows and sliding doors were their responsibility. For example, a letter dated March 28, 2003—written on behalf of the Board by Kelli Diehl, the property manager of Shipyard Village, to a co-owner in Building A—stated, in pertinent part: "It has been determined that during a hard rain, water flows under the threshold of your sliding glass door and leaks onto the unit below. The sliding doors are the owners' responsibility to maintain and thus, we are requesting that you take action to correct this problem." Furthermore, Dr. Leon Jennings—the president of the Board at that time—sent a letter informing co-owners that for various reasons, the Board did not endorse a lawsuit on behalf of the Board regarding the faulty windows. Instead, the Board "advise[d] all owners to have their windows inspected and repaired if needed."

In 2003, the Board hired Keystone Construction (Keystone) to study leaks that were manifesting themselves at some of the windows. Keystone concluded that the water was leaking through the stucco—not the windows. Keystone also found that non-existent window flashing[2] was part of the problem.

---

[1] At a special meeting of the Board that occurred on February 21, 2002, an engineer's report "stressed that problems from water intrusion are time related and tend to compound."

[2] Window flashing is not the responsibility of co-owners under section 3.6(c) of the Master Deed.

In 2004, after reporting water intrusion problems, Ben and Katie Morrow, co-owners of a unit in Building B, replaced their windows. However, even after replacing their windows, they continued to experience water intrusion problems and engaged an engineer, Donald Manning, who identified stucco cracks as the source of the water intrusion.[3] Ultimately, Manning confirmed that Building B was "sick and about to become cancerous," that the inside intrusion of moisture was "severe," and that some co-owners were in "denial of this ever-increasing problem."

At the Board meeting on February 17, 2006, Jennings discussed the stucco problems. Jennings explained that repairing individual windows would not solve leak issues, but rather, the leakage occurred at the window/stucco interface—a problem which required vertical stacks of windows be removed, flashed, and replaced at the same time. According to Jennings, stucco problems around a window were the Board's responsibility to repair, but if stucco was damaged during the installation of a window, the co-owner was responsible for repairing the stucco. In essence, Jennings acknowledged that it was "difficult and impractical" for owners to try to replace the windows.

A proposal from Pro-Tec Finishes, Inc., estimated a cost of approximately $2,400,000 to replace the windows in Buildings A and B. At the annual members' meeting on April 15, 2006, the Board attempted to amend the Bylaws to designate the windows and sliding glass doors as common elements (via the "window amendment")—and therefore, the responsibility of the Board. However, the amendment failed to receive the required two-thirds affirmative vote needed to pass. A motion was made, and carried unanimously, to leave the vote open for thirty days to allow those co-owners who did not vote at the meeting, to vote. However, upon subsequent discussions with its attorney, the Board decided not to leave the vote open.

Instead, on April 24, 2006, the Board sent a letter to co-owners stating that because the first vote on the window amendment did not pass, the Board "decided to start the amendment process over." Therefore, along with that letter, the Board mailed out a new proxy card to all co-owners, seeking the co-owners' approval of

_____

[3] Similarly, Shipyard Village's new site maintenance supervisor, Richard Bennett, determined that sealant joint failures at the window-stucco interface, as well as cracked stucco, could be causing the problem.

the window amendment, and instructing the co-owners to return the proxy card by mail or fax.[4]

On July 6, 2006, the Board sent a letter to co-owners, stating that the window amendment had passed. The letter did not address the voting procedure used to adopt the window amendment. In fact, the recorded amendment itself misrepresents the procedure, providing that "a Special Meeting was held on April 15, 2006 for the purpose of voting on this Amendment to the Master Deed."[5] Further, the window amendment did not explicitly make the sliding glass doors a common element.

In 2007, the Board hired Kenneth G. Schneider, Jr., who identified an "open joint" directly under the sliding glass doors' threshold between adjoining hollow core slabs of the balcony and unit, which allowed water to leak into the unit below. On September 18, 2007, Diehl e-mailed the Board regarding window leaks in Buildings A and B. The e-mail states, in pertinent part:

> Please understand that many, many of these units were leaking previously and because windows were the owners' responsibility, the issue was thrown back at the owners who most ended up doing nothing, and now that this is the [Board's] responsibility, owners are impatient . . . . Most of you were not on the board to remember but I tried to bring this up after I was here for a while and I got my hand slapped big time by Bobby Warner [the maintenance supervisor] and some board members because this was an owner responsibility. Bobby Warner only did cosmetic stucco repairs to these [buildings] for 20+ years and kept pushing back to the owners—who clearly could not handle and needed help.

---

[4] Section 1.3 of the Bylaws, which declares that votes may only be cast at meetings, and Section 1.5 of the Bylaws, which states that "[a]ny action which may be taken by a vote of the unit owners may also be taken by written consent to such action signed by *all* [co-]owners entitled to vote," are the only two voting procedures permitted under the governing documents for amending the Master Deed and Bylaws. (Emphasis added).

[5] The amendment was actually passed as a result of the proxy vote by mail, about which no meeting was held.

On April 19, 2008, the Board reported at the annual members meeting that Buildings A and B required extensive repairs, and that all co-owners' windows and sliding glass doors needed to be removed and replaced—work which would cost $12,000,000 to $13,000,000. At the meeting, the Board provided that all co-owners would be responsible for a proposed special assessment to fund the work, if it passed.

Around this time, one of the Board's consultants, HICAPS, gave a presentation to the Board identifying the problems in Buildings A and B. HICAPS identified two primary problems: (1) failures in the structural concrete, including corrosion of the reinforcing steel; and (2) the building envelope was not "weather tight." Another structural inspection revealed numerous failures in Buildings A and B: roof failure, façade failure, edge beam failure, soffit failure, concrete failure, expansion joint failure, horizontal surface failure, HVAC anchorage failure, and poor to non-existent flashing in the windows and doors.

In May 2008, co-owners who owned units in Buildings C and D hired attorney Jeff King, who sent a letter to the Board asserting that the proposed special assessment was invalid because the window amendment was not properly adopted under the Bylaws, and therefore, the total cost of repair and replacement remained the sole responsibility of the co-owners of Buildings A and B. In January 2009, a majority of co-owners of Buildings C and D brought a lawsuit challenging the validity of the window amendment.

As a result of the lawsuit, the Board called for a re-vote on the window amendment, and a vote on an additional "sliding glass door amendment"[6] at a special members meeting held on March 21, 2009. Both votes failed to obtain the required two-thirds affirmative vote to pass.

On July 8, 2009, the Board notified co-owners that the windows and sliding glass doors would be replaced in Buildings A and B, and that the "most efficient way to finance the necessary repairs is through a Special Assessment" and the "more cumbersome alternative called for in the Bylaws would make it necessary for the cost of the repairs to be added to the 2010 and 2011 Operating Fund[, and to] bill all homeowners monthly just like other homeowners['] expenses." The proposed assessment was $88,398 per unit for Buildings A and B; $64,868 per unit

---

[6] Similar to the window amendment, this amendment would have made each unit's sliding glass door a common element.

for three-bedroom units in Buildings C and D; and $68,471 for four-bedroom units in buildings C and D.

The co-owners voted against the special assessment. Consequently, the Board incorporated the repair costs into the 2010 and 2011 annual operating budgets. Minutes from the November 13, 2009, special meeting of the Board provide that the 2010 operational budget was increased to fund approximately half of the repairs and reconstruction of Buildings A and B. However, the Board never submitted the 2010 operational budget to the co-owners for their review and amendment, as required by the Bylaws.[7] The balance of the repairs and reconstruction were to be funded in the 2011 operational budget.

On October 7, 2009, Petitioners filed a new lawsuit, alleging negligence and gross negligence, negligent/gross negligent misrepresentation, breach of fiduciary duty, and breach of the Master Deed and Bylaws. This suit was consolidated with the prior lawsuit brought by co-owners of Buildings C and D.

In May 2012, Petitioners moved for summary judgment on their negligence and breach of fiduciary duty causes of action. Following a hearing, the trial court granted Petitioners' motion for summary judgment in part for the negligence claim on the issues of duty and breach. The trial court found that the Bylaws and Master Deed imposed affirmative duties on the Board to enforce, investigate, and correct known violations of the Master Deed and the Bylaws, and to investigate when presented with evidence showing that an individual co-owner's neglect in maintaining his or her unit resulted in damage to the common elements. The trial court found that the Board breached its duty to investigate the substantial evidence in the record that reasonably showed that co-owners neglected the maintenance of their leaking windows and sliding glass doors.

Ultimately, the trial court found that the Board was precluded from asserting protection under the business judgment rule for two reasons. First, the trial court found that "the standards of [the Board] are controlled by three specific

---

[7] Section 5.2 of the Bylaws provides that the Board shall "prepare, adopt and present, or cause to be prepared and presented, to the [c]o-owners at their annual meeting an annual budget" for the next fiscal year. Further, Section 5.3 of the Bylaws states that the budget, as adopted by the Board, may be amended upon the motion and affirmative vote of co-owners holding two-thirds of the percentage interest in the common elements.

documents"—Shipyard Village's Master Deed, its Bylaws, and the South Carolina Horizontal Property Act[8] (the Act)—"and not the general corporate standard of the business judgment rule." Second, the trial court found that the Board was precluded from asserting the business judgment rule based on its *ultra vires* conduct, as well as its lack of good faith and failure to exercise due care or reasonable care in discharging its duties under the Bylaws. Specifically, the trial court cited the Board's "lack of good faith in continuing to enforce the 2006 window amendment . . . when it admittedly knew the amendment was invalid and [un]enforceable in June 2008." Further, the trial court found that the Board's failure to place its adopted annual budgets on the agenda for presentation to the co-owners at the 2009 and 2010 annual members' meetings, as well as the Board's "invalid assessment" of costs, were *ultra vires* acts.

The court of appeals affirmed the trial court's grant of summary judgment on the existence of a duty to investigate.[9] *Fisher*, 409 S.C. at 182, 760 S.E.2d at 131. However, the court of appeals reversed the trial court's finding on the business judgment rule and its decision to grant summary judgment on the issue of breach, and remanded the case for trial. *Id.*

This Court granted Petitioner's petition for writ of certiorari to review the court of appeals' opinion.

## ISSUES PRESENTED

I.    Whether the court of appeals erred in reversing the trial court's finding that the business judgment rule does not apply to the Board's conduct?

II.   Whether the court of appeals erred in reversing the trial court's decision granting Petitioners summary judgment on the issue of whether the Board breached its duty to investigate?

## STANDARD OF REVIEW

On review of an order granting summary judgment, the appellate court

---

[8] S.C. Code Ann. §§ 27-31-10 to -440 (2007 & Supp. 2014).

[9] Neither party appeals the court of appeals' decision on this issue.

applies the same standard as that used by the trial court pursuant to Rule 56(c), SCRCP. *Turner v. Milliman*, 392 S.C. 116, 122, 708 S.E.2d 766, 769 (2011). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Turner*, 392 S.C. at 766, 708 S.E.2d at 769. In a negligence case, where the burden of proof is a preponderance of the evidence standard, the non-moving party must only submit a mere scintilla of evidence to withstand a motion for summary judgment. *Bass v. Gopal, Inc.*, 395 S.C. 129, 134, 716 S.E.2d 910, 912 (2011) (citation omitted). In determining whether any triable issues of material fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *Fleming v. Rose*, 350 S.C. 488, 493–94, 567 S.E.2d 857, 860 (2002).

## LAW/ANALYSIS

### I.      *Business Judgment Rule*

Petitioners argue the court of appeals erred in reversing the trial court's decision that Respondent is precluded from asserting the protection of the business judgment rule. We disagree.

In South Carolina, courts apply the business judgment rule to protect corporate directors. "'Under the business judgment rule, a court will not review the business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith.'" *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 599, 538 S.E.2d 15, 25 (Ct. App. 2000) (quoting *Dockside Ass'n, v. Detyens*, 291 S.C. 214, 217, 352 S.E.2d 714, 716 (Ct. App. 1987)); *see also Dockside Ass'n, v. Detyens*, 294 S.C. 86, 87, 362 S.E.2d 874, 874 (1987) ("We now uphold the [c]ourt of [a]ppeals' determination that the business judgment rule precludes judicial review of actions taken by a corporate governing board absent a showing of a lack of good faith, fraud, self-dealing or unconscionable conduct."). The business judgment rule applies to disputes between directors of a homeowners' association and aggrieved homeowners, and as the court of appeals has stated, "the conduct of the directors should be judged by the 'business judgment rule' and absent a showing of bad faith, dishonesty, or incompetence, the judgment of the directors will not be set aside by judicial action." *Goddard v. Fairways Dev. Gen. P'ship*, 310 S.C. 408, 414, 426 S.E.2d 828, 832 (Ct. App. 1993) (citing 4 S.C.

Juris. *Condominiums* § 42 (1991)).

A corporation may exercise only those powers granted to it by law, its charter or articles of incorporation, and any bylaws made pursuant thereto. *Seabrook Island Prop. Owners Ass'n v. Pelzer*, 292 S.C. 343, 347, 356 S.E.2d 411, 414 (Ct. App. 1987) (citing *Lovering v. Seabrook Island Prop. Owners Ass'n*, 289 S.C. 77, 344 S.E.2d 862 (Ct. App. 1986), *aff'd as modified*, 291 S.C. 201, 352 S.E.2d 707 (1987)). A corporation's actions taken within the scope of the powers granted it are considered *intra vires* acts; acts beyond the scope of its powers, however, are *ultra vires* acts. *See id.* The business judgment rule applies to *intra vires* acts of the corporation, but not to *ultra vires* acts. *Id.* In other words, while the business judgment rule protects a corporation's exercise of its best judgment when deciding between viable options in a given business-related situation, the business judgment rule is not a cloak that protects a corporation from a violation of its own bylaws.

Here, the court of appeals held that the trial court erred in finding the business judgment rule did not apply because the Master Deed, Bylaws, and the Act "applied instead." *Fisher*, 409 S.C. at 180, 760 S.E.2d at 130. Similarly, Respondent contends that the "trial court concluded that because the [] Act, the Master Deed, and the Bylaws all governed [the Board's] conduct, the business judgment rule offers . . . no protection." To the extent that the trial court found that Shipyard Village's governing documents and the business judgment rule are mutually exclusive, we agree that the trial court erred. While any *ultra vires* action of the Board, as well as any failure of the Board to comply with its affirmative duties under the governing documents, are not subject to the business judgment rule, the mere existence of the Master Deed, Bylaws, and the Act does not preclude the application of the business judgment rule.

The court of appeals also found that the trial court "erred in finding that because the [Board] committed two acts it found to be *ultra vires*, the business [judgment] rule did not apply to any of its actions." *Id.* at 180–81, 760 S.E.2d at 130. We agree with the court of appeals. Even if the Board did commit *ultra vires* acts, those acts would not preclude the Board from asserting the protection of the business judgment rule for *intra vires* acts, made in good faith. On that note, we emphasize that because the business judgment rule only applies where a corporation acts within its authority, without corrupt motives, and in good faith, *see Kuznik*, 342 S.C. at 599, 538 S.E.2d at 25, the court of appeals incorrectly stated that "any investigation" conducted by the Board pursuant to its duty to

investigate "would be looked at under the business judgment rule to determine if the [Board] met its duty." *See Fisher*, 409 S.C. at 181, 760 S.E.2d at 130.

Therefore, we affirm as modified the court of appeals' reversal of the trial court's ruling on the business judgment rule. The trial court should permit Respondent to assert the business judgment rule as a defense at trial. Nevertheless, the Board will not be entitled to the protection of the business judgment rule if the jury finds that the Board acted beyond the scope of its authority, or acted with corrupt motives or in bad faith. Therefore, ultimately, the jury must decide whether the Board violated the requirements of the Master Deed and Bylaws, which of the Board's actions were *intra vires* and which were *ultra vires*, and the impact of that breakdown on Petitioners' negligence claim.

## II.  *Summary Judgment on Breach of Duty*

Petitioners argue the court of appeals erred in reversing the trial court's decision to grant them summary judgment on the issue of breach of the duty to investigate. Respondent, on the other hand, contends that the record contains at least a mere scintilla of evidence that Respondent did not breach its duty to investigate, and thus, the Court should uphold the court of appeals' decision. We agree with Respondent.

The issue of negligence is a mixed question of law and fact. *Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 393 S.C. 240, 246, 711 S.E.2d 908, 911 (2011) (citing *Moore v. Weinberg*, 373 S.C. 209, 221, 644 S.E.2d 740, 746 (Ct. App. 2007)). A court must first determine, as a matter of law, whether the law recognizes a particular duty. *Id.* (citing *Moore*, 373 S.C. at 221, 644 S.E.2d at 746). If a duty exists, the jury then determines whether the defendant breached the duty, resulting in damages. *Moore*, 373 S.C. at 221, 644 S.E.2d at 746.

Here, the trial court ruled:

[The Board] had a duty to investigate[,] when presented with evidence which would show or reasonably show that an individual [co-owner's] neglect in maintaining his or her [u]nit has resulted in damage to the common elements[,] that an investigation is required by the Bylaws. That is the [Council] through its Board, upon receiving such information, would be required to initiate some investigation to determine whether or not it would be appropriate to individually

assess the defaulting [co-owner] for the damage . . . .

The trial court then found as a matter of law that the Board breached its duty when it failed to determine: (1) whether the water intrusion damage to the common elements of Buildings A and B was the fault of a particular co-owner, or group of co-owners; and (2) whether other non-defaulting co-owners were entitled to a rebate by individual assessment from the A and B co-owners who caused the damage.

We find evidence in the record that could support the conclusion that the Board indeed breached its duty to investigate. For example, there is evidence that the Board had actual notice of the leaks occurring in Buildings A and B since 1983, that the co-owners in those buildings were neglecting the problems, and that the co-owners' neglect to repair their own windows and doors caused damage to the common elements. Further, as Petitioners point out, Respondent acknowledged on the record that it never asked any qualified expert to allocate the damages to the common elements attributable to the leaking windows and sliding glass doors and the alleged failure of the co-owners to maintain those windows and sliding glass doors.

However, when viewed in the light most favorable to Respondent, there is at least a scintilla of evidence in the record to indicate an issue of material fact as to whether the Board breached its duty to investigate, as set forth by the trial court. *See Bass*, 395 S.C. at 134, 716 S.E.2d at 912; *Fleming*, 350 S.C. at 493–94, 567 S.E.2d at 860. In the years preceding the initiation of this lawsuit, the Board hired numerous engineers and consultants to determine the cause of the water intrusion. In addition to citing leaks around the windows and doors, these engineers and consultants' reports attributed the water intrusion problems to the common elements—including the stucco and various components of the building envelope system. For instance, Keystone concluded that the water was leaking through the stucco, and that non-existent window flashing was part of the problem. Moreover, Schneider determined that the water was leaking at the "stacks" of the units, while HICAPS informed the Board that the building envelopes were not water tight and allowed water to enter the structures. In sum, there is evidence in the record to support a conclusion that the water leaks occurred due to water intrusion through the common elements, and thus, the Board could have made an informed decision not to apportion the costs of the damage to the co-owners. As a result, the trial court should not have decided the question of whether the Board breached its duty to investigate as a matter of law.

Therefore, we hold that the trial court erred in granting Petitioners' motion for summary judgment, as the jury should have decided whether the Board breached its duty to investigate.  Accordingly, we affirm the court of appeals' decision on this issue.

## CONCLUSION

Based on the foregoing, we affirm as modified the court of appeals' decision and remand the case for trial.

**AFFIRMED AS MODIFIED.**

**PLEICONES, C.J., BEATTY, KITTREDGE and HEARN, JJ., concur.**